In re KROH BROTHERS DEVELOP-
MENT COMPANY, Kroh Brothers Eq-
uity Company, Kroh Brothers Realty
Company, Kroh Investments I, Inc.,
Kroh Telecommunities, Inc., Ward
Parkway Corp., Missouri Corporations,
Debtors.

KROH BROTHERS DEVELOPMENT
COMPANY and The Kroh Operating
Limited Partnership, By I.I. Ozar, Man-
aging Agent and Estate Administrator,
Plaintiffs,

v.

AOKI LANDSCAPE MAINTENANCE,
INC., et al., Defendants.

Bankruptcy Nos. 87–00640–1–11, 87–
01265–1–11, 87–00641–1–11, 87–01263–1–
11, 87–01930–1–11 and 87–01266–1–11.
Adv. No. 88–0581–1–11.

United States Bankruptcy Court,
W.D. Missouri.

July 28, 1989.

Jonathan Margolies, McDowell, Rice &
Smith, Kansas City, Mo., for plaintiffs.

Kenneth C. Jones, Watson, Ess, Marshall
& Engas, Olathe, Kan., for Continental
Const. Eng.

MEMORANDUM ORDER ON PLAIN-
TIFFS CLAIMS AGAINST DEFEN-
DANT CONTINENTAL CONSTRUC-
TION ENGINEERS, INC.

KAREN M. SEE, Bankruptcy Judge.

Three issues are presented in this adver-
sary: (1) whether defendant Continental
Construction Engineers, Inc. presented suf-
ficient evidence to establish its "ordinary
course of business" defense under
§ 547(c)(2); (2) whether the date of delivery
of a check or the date the drawee bank
honors the check is the "date of transfer"

within the meaning of § 547(c)(4); and (3) whether "new value" under § 547(c)(4) must remain unpaid. At the close of trial the court entered findings and conclusions on defendant's § 547(c)(2) defense, which are included in this opinion. Due to splits of authority on the remaining two issues, the court requested briefs. The parties have submitted post-trial briefs and the issues are ready for decision. Also pending is defendant's post-trial Motion to Amend the Evidence. For reasons set forth in this opinion, that Motion will be granted.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. General Findings and Conclusions

The court has jurisdiction over this proceeding pursuant to Decretal Paragraph 24 of its Order confirming the plan of reorganization in the main bankruptcy case of plaintiff Kroh Brothers Development Company (Kroh).[1] That paragraph provides that the bankruptcy court shall retain jurisdiction over Debtors' Chapter 11 cases in accordance with Article 13 of the Plan.[2]

Defendant's evidence consisted of 189 exhibits and the testimony of Philip Gibbs, Continental's president. Continental, formed in August, 1976, is a civil engineering firm that works primarily on real estate development projects being developed by private developers. Its working relationship with Kroh began in 1981 and continued until Kroh filed bankruptcy on February 13, 1987. Gibbs testified that in 1985 and 1986 50% to 60% of Continental's business was with Kroh.

The first payment in question was a check for $46,887.34 that Gibbs picked up from Kroh's offices on December 12, 1986. It cleared the bank on December 22, 1986. Continental conceded at trial that this transfer was preferential. Accordingly, the court finds that the elements of § 547(b) have been met with respect to the $46,887.34 transfer. The parties stipulated that the date of demand for return of the $46,887.34 payment was March 24, 1988.

On December 15, 1986 Continental received from Kroh an additional check for $10,512.79. It cleared the bank on January 6, 1987. This check was not produced by defendant during discovery and thus was not admitted into evidence at trial. Defendant discovered the check post-trial and filed a motion to amend the evidence to include evidence of the check, its date of delivery and the date it cleared the drawee bank. Plaintiffs did not object to the motion. The motion will be granted. Defendant concedes the preferential nature of this second transfer in its post-trial filings. Accordingly, the court finds the elements of § 547(b) have been met with respect to the $10,512.79 payment.

Because the court found, as admitted by defendant, that all the elements of § 547(b) were present with respect to both the $46,887.34 and the $10,512.79 transfer, the court concludes that preferential transfers in those amounts occurred. The remaining findings and conclusions deal solely with defendant's defenses under § 547(c)(2) and (c)(4). Defendant bears the burden of proving these defenses. 11 U.S.C. § 547(g).

### II. Ordinary Course of Business Defense Under § 547(c)(2)

Section 547(c)(2) provides that a preferential transfer is not avoidable to the extent the transfer was:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms[.]

1. "Findings of Fact, Conclusions of Law and Order Confirming Second Amended Joint Plan of Reorganization Proposed by Debtors and the Ozar Partnership as Modified," Doc. No. 1361, *In re Kroh Brothers Development Company,* 87–00640–1–11 (W.D.Mo. 3/8/88).

2. The retention of jurisdiction provision in the Plan was recently upheld. *See TMS Associates v. Kroh Brothers Development Co.,* No. 88–W–358–5 (W.D.Mo. 4/10/88) (Wright, C.J.).

## A. The $10,512.79 Transfer

As stated in defendant's Motion to Amend Evidence, the court finds the $10,512.79 transfer was for payment on three invoices numbered 1980, 2000 and 2001. The invoices were not produced. Without the invoices it is impossible to make any findings under § 547(c)(2)(B) concerning the terms of payment and payment history on the projects billed for by the invoices. Additionally, there is no evidence in the record that the debts underlying the invoices were incurred in the ordinary course of business between the parties as required by § 547(c)(2)(A). Accordingly, the court makes no findings on those questions. Because there is no evidence from which it can be determined whether the elements of § 547(c)(2)(A) and (B) have been met, the court concludes defendant did not meet its burden of proof under § 547(c)(2) as to the $10,512.79 payment.

## B. The $46,887.34 Transfer

■ The $46,887.34 transfer was for payment of 12 invoices for work done on three projects. Gibbs' testimony showed the work done on each project was requested by Kroh and that Kroh was billed for work performed at the end of each month. The court finds that, with respect to this transfer, defendant sustained its burden of proof under § 547(c)(2)(A) that the debts were incurred in the ordinary course of the parties' business.

Based on Plaintiffs' Exhibit 1, Defendant's Exhibits 1–12 and Defendant's Exhibit 152, the court finds the $46,887.34 transfer was made for the following invoices and respective projects and that payment on those invoices was received the following number of days after the date of the invoice with respect to each project:

| INVOICE NUMBER | DATE OF INVOICE | PROJECT NAME | DAYS LATE |
|---|---|---|---|
| 1774 | 4–30–86 | 119th | 226 |
| 1819 | 5–31–86 | 119th | 195 |
| 1846 | 6–30–86 | 119th | 165 |
| 1901 | 7–31–86 | 119th | 134 |
| 1925 | 8–31–86 | 119th | 103 |
| 1959 | 9–30–86 | 119th | 73 |

| INVOICE NUMBER | DATE OF INVOICE | PROJECT NAME | DAYS LATE |
|---|---|---|---|
| 1736 | 3–31–86 | Hallbrook | 256 |
| 1777 | 4–30–86 | Hallbrook | 226 |
| 1798 | 4–30–86 | Hallbrook | 226 |
| 1849 | 6–30–86 | Hallbrook | 165 |
| 1790 | 4–30–86 | Lee's Summit | 226 |
| 1928 | 8–31–86 | Lee's Summit | 103 |

Section 546(c)(2)(B) requires a showing that the transfer was made in the ordinary course of business between the parties. This element implicitly requires proof, first, of the ordinary course of business between the parties and, second, that the transfer in question was within the bounds of the parties' ordinary course of business. Defendant failed to meet its burden of proof under § 547(c)(2)(B) for the following reasons.

First, defendant failed to satisfactorily prove what the ordinary course of business was between itself and Kroh in regard to terms of payment. Gibbs testified, and the court finds, there was no written agreement between defendant and Kroh concerning terms of payment. The understanding between Continental and Kroh concerning terms of payment was that on both major and smaller projects Continental would be paid in full or the account would be brought current at the time construction financing was secured for a project. If no construction financing was in place by end of the year, Kroh would bring an account current with "catch up" year-end payments in November and December. Gibbs testified that Kroh was sensitive to the fact that Continental gave employees Christmas bonuses and that it relied on Kroh's "catch up" payments in determining those bonuses. Gibbs also stated these terms of payment would be problematic if it were a smaller customer or a smaller project and that one would have to have a "good understanding" with those customers.

However, the evidence shows and the court finds that after 1982 Kroh did not "catch up" on payment for most of its projects at the end of the year. The following chart, compiled from Defendant's Exhibit 152,[3] shows there were always Octo-

3. Defendant's Exhibit 152 is a chart showing the entire payment history between defendant and Kroh.

ber and November invoices from the preceding year that did not get paid until the next year:

| YEAR | TOTAL PAID IN THAT YEAR | TOTAL INVOICED PRIOR TO 12/1 OF THAT YEAR BUT PAID IN THE FOLLOWING YEAR |
|---|---|---|
| 1983 | $ 45,468.61 | $13,969.50 |
| 1984 | $109,442.73 | $ 4,812.55 |
| 1985 | $105,237.43 | $26,717.82 |
| 1986 | $179,068.90 | Not Available |

Defendant's theory that the ordinary course terms of payment were for year-end "catch up" payments on smaller and larger projects is rejected in view of the court's finding that Kroh was never currently paid at year end after 1983.

Defendant's evidence also failed to show that payment was delayed until construction financing was in place and then became more regular. Other than the evidence regarding the projects for which defendant received the $46,887.34 payment, there was no evidence of when or if the remaining projects set forth in Exhibit 152 received construction financing. Absent such evidence the court cannot determine whether the payment scheme for projects paid by construction loans, as described by Gibbs, in fact existed between defendant and Kroh.

Based on the above findings, the court further finds that defendant's evidence of Kroh's payment history does not support the theory that Kroh made "catch up" payments at the end of each year to bring each account current. Nor does the evidence support the theory that payments became current once construction financing was in place. Accordingly, defendant did not prove the terms of payment between itself and Kroh.

Second, even if defendant had proved the terms of payment between itself and Kroh, defendant failed to prove, as to the 119th and Hallbrook projects, that the $46,877.34 transfer was a payment according to those terms. Concerning the 119th Street project, Gibbs testified that the terms of payment were that Continental was to be brought up to date on the project when the construction financing was in place. However, according to Gibbs there was no final financing on that project. The court finds that the following, taken from Exhibit 152, is the payment history on the 119th Street project:

| INVOICE DATE | PAYMENT DATE | DAYS LATE |
|---|---|---|
| 8–31–85 | 11–21–85 | 82 |
| 101–31–85 | 1–24–86 | 85 |
| 11–30–85 | 2–2686 | 88 |
| 12–31–8[5] | 5–07–86 | 128 |
| 1–31–86 | 5–22–86 | 112 |
| 9–30–86 | 12–12–85 OR | 73 |
| 8–31–86 | 12–22–86 | 103 |
| 7–31–86 | | 134 |
| 6–30–86 | | 165 |
| 5–31–86 | | 195 |
| 4–30–86 | | 226 |

According to Gibbs' testimony, Continental should have been paid nothing on any of the work done because no final financing was ever in place on the project. Alternatively, Continental should have been paid on its August, October, November and possibly December, 1985 invoices at the end of 1985. Only the August invoice was paid according to the terms of payment expressed by Gibbs. The October, November and December invoices were not paid until well into 1986.

Concerning the Hallbrook project, Gibbs testified the terms of payment on the project were those of its general understanding with Kroh. According to Gibbs there was no final financing on this project, either. The court finds the following, taken from Exhibit 152, is the payment history on the Hallbrook project:

| INVOICE DATE | PAYMENT DATE | DAYS LATE |
|---|---|---|
| 6–30–85 | 9–19–85 | 81 |
| 7–31–85 | 11–05–85 | 127 |
| 9–30–85 | 12–06–85 | 67 |
| 10–31–85 | 1–16–86 | 77 |
| 11–30–85 | 3–06–86 | 97 |
| 12–31–85 | 4–18–86 | 109 |
| 1–31–86 | 5–7–86 | 97 |
| 1–31–86 | 5–22–86 | 112 |
| 2–28–86 | 11–07–86 | 253 |
| 3–31–86 | 11–07–86 | 221 |
| 4–30–86 | 11–07–86 | 191 |
| 5–31–86 | 11–07–86 | 160 |
| 6–30–86 | 11–07–86 | 130 |
| 7–31–86 | 11–07–86 | 99 |
| 6–30–86 | 12–12–86 OR | 165 |
| 4–30–86 | 12–22–86 | 226 |
| 4–30–86 | | 226 |

| INVOICE DATE | PAYMENT DATE | DAYS LATE |
|---|---|---|
| 3-31-86 | | 256 |

According to Gibbs' testimony, defendant should not have been paid for any of the work done because no final financing was ever in place on the project. Alternatively, defendant should have been paid on its October, November and possibly December, 1985 invoices at the end of 1985. Only the July and September invoices were paid according to the alternative terms of payment expressed by Gibbs. The October, November and December, 1985 invoices were not paid until well into 1986.

Further, Kathy Lowery, a staff accountant for Kroh during 1986, testified on behalf of plaintiffs that, in fact, two loans on the Hallbrook project closed in mid-September, 1986. Gibbs also testified that, once construction financing was in place, payment was expected on a 30 to 45 day basis beginning after the financing. Thus, on all of the 1986 invoices paid in November and December, 1986 defendant should have received payment no later than the end of October, 1986.

For these reasons, the court alternatively finds that defendant failed to meet its burden of proving that the $46,877.34 transfer was a payment made in accordance with the terms of payment established between the parties.

Third, even if defendant sustained its burden of proof on the terms of payment and proven that the $46,877.34 transfer was a payment made in accordance with those payment terms, the $46,877.34 transfer was not typical of year-end "catch up" payments made in previous years. The court finds that the November and December, 1986 "catch up" payments were by far the largest ever made to defendant by Kroh both in terms of amounts of the checks and in terms of the percentage of year-end "catch up" payments to the payments made by Kroh during that year. The $46,887.34 transfer was the largest year-end payment received by Continental from Kroh in the history of their business dealings. Year end payments in 1983, 1984 and 1985 ranged from $9,019.20 to $14,-825.65. The $46,887.34 transfer was three times as large as any single year end payment prior to 1986.

The two year end payments in 1986 totaling $76,877.34 represented 51% of the payments made by Kroh to Continental during 1986. By comparison, that figure was 20% in 1983, 36% in 1984 and 27% in 1985. This abnormality in amount of payment and percentage of total payments further compels the court to conclude that the $46,887.34 transfer was not in the ordinary course of Kroh's and Continental's business. These findings are set forth in the following chart:

| YEAR | TOTAL PAID IN THAT YEAR | LARGEST "CATCH UP" PAYMENT FOR THAT YEAR | TOTAL END OF YEAR "CATCH UP" PAYMENTS | PERCENT OF "CATCH UP" PAYMENTS OF TOTAL PAID IN THAT YEAR | TOTAL INVOICED PRIOR TO 12/1 OF THAT YEAR PAID IN FOLLOWING YEAR |
|---|---|---|---|---|---|
| 1983 | $ 45,468.61 | $ 3,125.00 | 9,019.20 | 20% | $13,969.50 |
| 1984 | $109,442.73 | $14,825.65 | 39,265.86 | 36% | $ 4,812.55 |
| 1985 | $105,237.43 | $ 9,745.96 | 28,841.85 | 27% | $26,717.82 |
| 1986 | $179,068.90 | $46,887.34 | 90,949.09 | 51% | Not Available |

Gibbs asserted that the large year-end "catch up" payments were because Continental's business with Kroh increased every year and the size of Kroh's projects increased every year. The court discounts this explanation for two reasons. First, although defendant offered some evidence that the size of some of the projects in 1985 and 1986 were larger, it offered no clear evidence sufficient to convince the court of that fact. Second, the percent of end of year payments to total payments increased every year. If, in fact, the larger year-end

payments were due solely to larger projects or a larger volume of business with Kroh with all else staying the same, the size of payments would increase without a resulting increase in the percentage. As the chart above indicates, that did not happen.

Thus, the court concludes there was no clear evidence of what the ordinary terms of payment were between the parties. Even if there had been, the evidence does not support a finding that the $46,887.34 transfer was in accordance with the terms of payment. It is only clear that Kroh was a large client who was very important to the firm and defendant accommodated Kroh in order to continue the business relationship by allowing Kroh to be a slow paying customer. The fact that defendant accepted whatever varying payment terms Kroh dictated does not mean those terms were the ordinary course for defendant and Kroh. Accordingly, the court concludes that defendant did not meet its burden of proof under § 547(c)(2)(B) with respect to the $46,887.34 payment.

Finally, defendant failed to meet its burden of proof under § 547(c)(2)(C) that the $46,887.34 transfer was made according to ordinary business terms. First, Gibbs testified concerning payment terms on his projects with other clients. This testimony did not convince the court that the civil engineering industry, in general, accepts payment on both large and small projects either at the end of each year or if and when construction financing becomes available. Additionally, the court also concludes that varying terms of payment focused on accommodating a particular client are not the ordinary course in defendant's industry or in general. For these reasons, and without relying on plaintiffs' rebuttal testimony of Mr. Taliaferro, the court concludes that defendant also failed to meet its burden of proof on § 547(c)(2)(C).

For the above reasons, the court finds that defendant did not meet its burden of proof with respect to its defense under § 547(c)(2) for either the $46,887.34 or the $10,512.79 transfer.

### III. Subsequent New Value Defense Under § 547(c)(4)

#### A. Date of Transfer Under 11 U.S.C. § 547(c)(4)

■ Defendant also asserts the defense provided by § 547(c)(4), commonly referred to as the "subsequent advance rule". Two issues arise in determining whether and to what extent defendant has met the burden of proving this defense. First, the parties disagree concerning whether the date of the transfer for purposes of a § 547(c)(4) defense is the date of delivery of a check or the date on which the drawee bank honors and pays the check. Plaintiffs recognize that "some conflict exists" on this issue but maintain that the precedent in this jurisdiction is contained in *Dubuque Packing Co. v. Stonitsch (Matter of Isis Foods, Inc.)*, 37 B.R. 334 (W.D.Mo.1984), and that the *Isis* decision dictates that the date a check is honored is the relevant date. Defendants contend: (1) that *Isis* was not decided under § 547(c)(4); (2) even if it is on point it is in conflict with subsequent appellate decisions holding that under § 547(c)(2) the relevant date is the date of delivery; and (3) the clear weight of authority as to § 547(c)(4), specifically, is that the date of delivery controls. The court agrees with defendant's contentions for the following reasons.

First, the *Isis* decision is not on point. It construed § 549, a section that allows a trustee to avoid post-petition transfers. In *Isis* the trustee sought to avoid three alleged post-petition transfers under § 549(a). Each transfer involved debtor's purchase of goods from a supplier and payment by check prior to the bankruptcy filing. However, the checks were not honored until after debtor filed bankruptcy. 37 B.R. at 335. The bankruptcy court found that payment occurred when the checks were honored, but because payments as to two of the transactions were made "reasonably contemporaneously" with delivery under § 547(c)(2), the payments merely represented a continuation of debtor's ordinary business. Therefore, the bankruptcy court concluded that those payments should not be avoided. 37 B.R. at

335–36. Because the third transaction took more than 45 days to complete,[4] the bank-ruptcy court allowed the trustee to recover that payment. 37 B.R. at 335 n. 1.

On appeal, the district court first discussed the definition of "transfer," looking to state law as well as the Bankruptcy Code for guidance. The court relied on the Uniform Commercial Code as adopted by Missouri and concluded that a transfer did not occur until the date a check was honored. 37 B.R. at 336. The court also distinguished two bankruptcy court decisions holding that the date of delivery was the relevant date under § 547(c)(2) on the grounds that those courts had incorrectly relied on certain legislative history. Because all the transfers occurred post-petition and because § 549 contains its own exceptions, the district court held that the application of a § 547(c) defense to a § 549 claim was incorrect. 37 B.R. at 336–37.

After due consideration of *Isis* and the fact that it was a proceeding under § 549, this court agrees with defendant's contention that *Isis* is not on point when considering defenses under § 547(c). The holding in *Isis* that the date a check is honored is the controlling date as to when a transfer occurs was limited exclusively to that court's consideration of § 549. Accordingly, the court must refer to other decisions that discuss this issue in terms of defenses under § 547(c).

The Eighth Circuit recently recognized the different policies underlying the basic avoidance provisions of the Code, as set forth in § 547(b) and the affirmative defense to a preferential transfer in § 547(c)(4):

> The general avoidance portion of the Bankruptcy Code was intended to 'facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.' H.R.Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* 1978 U.S. Code Cong. & Admin.News 5787, 5963, 6138. Nevertheless, the subsequent advance rule, section 547(c)(4), 'was not en-

acted to ensure equitable treatment of creditors, but rather is intended to encourage creditors to deal with troubled businesses.' *Chaitman v. Paisano Automotive Liquids, Inc. (In re Almarc Mfg., Inc.),* 62 B.R. 684, 687–88 (Bankr.N.D.Ill.1986) (footnote omitted); *see also Gold Coast Seed Co. v. Spokane Seed Co. (In re Gold Coast Seed Co.),* 30 B.R. 551, 553 (9th Cir.1983) ('The purpose of § 547(c)(4) is precisely to encourage trade creditors to continue dealing with troubled businesses.')

*Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275, 1280 (8th Cir.1988).

Other courts which recognize the different policies underlying the avoidance provisions of § 547(b) and the defenses in § 547(c) also recognize that the date of transfer may vary depending on which policy is being considered. Courts have held that the date a check is honored controls when determining the existence of a preferential transfer under § 547(b), while the date the check is delivered controls when determining a creditor's affirmative defenses under § 547(c). *See e.g., Chaitman v. Paisano Automotive Liquids, Inc. (In re Almarc Mfg., Inc.),* 62 B.R. 684, 687–69[6] (Bankr.N.D.Ill.1986), *and cases cited therein, cited favorably in Bellanca Aircraft, supra.* The rationale for different controlling dates was explained by Judge Robert Ginsberg in *Almarc,* 62 B.R. at 687–88:

> [Sections] 547(b) and 547(c)(4) have entirely different purposes. Section 547(b) is designed to allow the debtor or trustee to avoid transactions that favor creditors. (citation omitted). The key focus is the recovery of funds to the estate for equitable distribution among creditors of equal priority. The fact that the payee is not vested with any title to the funds until the check is honored by the drawee bank has prompted most courts to find that no transfer occurs under § 547(b) until the check is honored. (citation omitted).

---

4. *Isis* was decided when the 45–day element was still a part of § 547(c)(2). The 45–day portion has been repealed.

Section 547(c)(4) was not enacted to ensure equitable treatment of creditors, but rather is intended to encourage creditors to deal with troubled businesses. (footnote omitted) (citations omitted). The key focus under § 547(c)(4) is to treat fairly a creditor who has replenished the estate after having received a preference. . . .

Holding that the transfer occurs upon receipt of the check for these purposes furthers the goal of § 547(c)(4) and leads to a more appropriate result in policy terms. In most cases, absent a post-dated check or a request to hold the check, parties in a normal business transaction would ... treat a check as a cash transaction and extend new credit immediately upon receiving a check in payment of a prior debt rather than waiting until the check has cleared to send new goods. (citation omitted). There is no policy reason why a creditor who waits for a check to clear before shipping should get the benefit of the § 547(c)(4) setoff while a creditor who, doing what most business people do, ships on receipt of a check, should be denied the setoff. In both cases, the check ultimately clears and the estate is diminished to that extent. More importantly in both situations the allowance of the setoff does not injure the estate because ... the estate is enriched to the extent of the goods shipped which is, of course, the exact amount set off. (citation omitted).

Additionally, several appellate court opinions decided after *Isis* recognize that the policy underlying § 547(c)(4), which was recognized by the Eighth Circuit in *Bellanca Aircraft*, is also the policy that underlies the defense to a preferential transfer found in § 547(c)(2). *See Durham v. Smith Metal and Iron Company (In re Continental Commodities, Inc.)*, 841 F.2d 527, 529–30 (10th Cir.1988); *Bernstein v. RJL Leasing (In re White River Corp.)*, 799 F.2d 631, 633–34 (10th Cir.1986) (policy objectives of § 547(c)(2) are to encourage trade creditors to continue dealing with troubled businesses by insulating normal business transactions from the trustee's avoiding power); *O'Neill v. Nestle Libby's P.R., Inc.*, 729 F.2d 35 (1st Cir.1984). Each of these decisions held that the date of delivery of a check constitutes the date of transfer under § 547(c)(2). *Continental Commodities*, 841 F.2d at 530[2]; *White River*, 799 F.2d at 633–34[2]; *O'Neill v. Nestle Libby's*, 729 F.2d at 37[1]. *See also Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d 805, 808[2] (5th Cir.1989).

In *Bellanca*, the Eighth Circuit did not address the issue whether the date of honor or the date of delivery controls under § 547(c)(4). However, it did recognize the policy underlying that section. Other appellate courts recognize that the same policy applies to other defenses in § 547(c) and accordingly hold that the date of delivery determines the date of transfer for § 547(c) purposes. Because of the precedent at the appellate level in this and other circuits, this court concludes that the § 547(c) defenses should be construed in light of the parties' reasonable business expectations and in a manner that comports with business practice. Accordingly, the court holds that ordinarily the date a check is delivered controls the date of transfer pursuant to § 547(c)(4). The court further holds that the check must be presented within the "30-day period deemed reasonable under the U.C.C." and honored upon presentment for the delivery date to be considered the time of transfer. *See O'Neill*, 729 F.2d at 38. No evidence was presented indicating that the preferential transfers in this case were either dishonored or were not timely presented. Therefore, the court concludes that the transfers in question occurred on the date the checks were delivered, December 12, 1986 and December 15, 1986.

## B. Value to Kroh of Services Performed After December 12, 1986

Gibbs' testimony was undisputed that the work performed for Kroh after December 12, 1986 [5] was authorized by someone at

---

5. Defendant does not contend that any of the services rendered prior to December 12, 1986—the date Gibbs picked up the $46,887.34 check—or on that date can be included in the determination of its "subsequent new value" defense under § 547(c)(4).

Kroh. The court finds the services were authorized.

### 1. Value to Kroh of the Services Performed on Hallbrook Project

There is a question concerning whether Kroh's interest in the Hallbrook project terminated on December 22, 1986 or January 18, 1987. For the purposes of this proceeding, only, and based only on Plaintiffs' Exhibits 5 and 6, the court makes the following findings and conclusions.

Kroh was the sole general partner of KBHF Associates, a Kansas limited partnership. The sole limited partners were George and John Kroh, owners of Kroh. Prior to August 27, 1986 Hallbrook Farm Associates (HFA) owned Hall Farm, the land on which the Hallbrook project was being developed. On August 27, 1986, HFA and KBHF entered into an Option Agreement, under which HFA granted to KBHF a series of options to purchase a portion of the Hall Farm, and a Contract to Purchase a portion of the Hall Farm. On October 31, 1986, HFA conveyed certain portions of the Hall Farm (Tract) to KBHF.

In late 1986, it became clear that Kroh and KBHF could not perform their obligations on the Hall Farm development, so Mr. Donald Hall, HFA's managing partner, sent a letter dated January 2, 1987 to George Kroh. The letter stated in pertinent part:

> I understand that, despite my letters to you dated December 22, 1986, terminating the [Contract to Purchase and Option Agreement], ... KB ... is continuing development activity with respect to the Tract....
>
> HFA hereby repeats its demand, set out in my December 22, 1986 letters, that KBHF immediately reconvey the Tract to HFA, and also demands that KBHF, pending such reconveyance, cease all development activities with respect to the Tract.

After the January 2 letter, an "Agreement of Settlement, Release and Recision" was executed on January 18, 1987 by HFA, Kroh and other persons not relevant to this opinion. Plaintiffs' Exhibit 5. In the Agreement, HFA agreed not to sue Kroh on certain matters relating to the funding of development of the Tract. Paragraphs M and N of the recitals to the Agreement state:

> M. On December 22, 1986, HFA served notices on KBHF [and] KB ... terminating the Contract and the Option Agreement....
>
> N. By reasons of the foregoing, disputes exist between HFA and the other parties to this agreement which they desire to settle, compromise and adjust.

Paragraph 9 of the consideration portion of the Agreement provides that Kroh "hereby assign[s] and transfer[s] to HFA all of [its] respective plans, drawings, documents, and other instruments or papers in any way related to or concerned with the development and marketing of the Hall Farm, all of which items shall hereafter be the sole property of HFA." Paragraph 11 of the Agreement states that *"[t]he parties agree that, effective as of the date hereof, the Contract [and] Option Agreement ... are rescinded, cancelled, terminated and annulled,* except as otherwise expressly stated herein." Plaintiffs' Exhibit 5 (emphasis added). The Agreement does not provide elsewhere for a different termination date of the Contract and Option to Purchase.

Plaintiffs argue that the termination date should be December 22, 1986. In support of this argument, plaintiffs point to Plaintiffs' Exhibit 6 and the Agreement, which both refer to letters purporting to terminate the Option Agreement and the Contract to Purchase on December 22, 1986. Additionally, plaintiffs attached copies of these letters to its post-trial brief. The letters were neither introduced nor admitted into evidence at trial and plaintiffs did not move to reopen proceedings in order to have the letters admitted into evidence. Defendant objected to consideration of the letters as evidence in its post-trial filings.

The court agrees with defendant that the letters should not be considered part of the record. There has been no formal motion that the record be amended to include the letters. Nor is there any indication that the letters were unavailable to plaintiffs at

the time of trial. Accordingly, the court concludes that the only documents on this issue placed into evidence at trial were the Agreement, Plaintiffs' Exhibit 5, and the letter from Mr. Hall to George Kroh dated January 2, 1987, Plaintiffs' Exhibit 6.

In reviewing these documents, it is clear to the court that, despite plaintiffs' arguments to the contrary, the services rendered by Continental in regard to the Hallbrook project after December 22, 1986 and prior to January 18, 1987 did have value to Kroh. These services were part of the consideration for the Agreement and were transferred to HFA as a result of the Agreement. Agreement at Par. 9, p. 6. Further, although the Agreement recognized that Mr. Hall sent letters of termination on December 22, 1986, those letters were not incorporated into the Agreement. Rather, the court finds that before January 18, whether the Contract and Option Agreement were terminated was disputed by the parties, and that dispute was resolved by the Agreement, which plainly states that "effective as of [January 18, 1987], the Contract [and] the Option Agreement ... and any and all rights, duties and liabilities arising thereunder, are rescinded, cancelled, terminated and annulled, except as otherwise expressly stated herein." Agreement at Par. 11, p. 6–7. As noted previously, there was no other exception to the termination date of the Contract or the Option Agreement in the Agreement. Thus, the clear, unequivocal language of the Agreement states that the Contract and Option Agreement terminated on January 18, 1987.

For the above reasons, the court concludes that the services rendered by defendant on the Hallbrook project were part of the consideration for the Agreement and that the Agreement terminated the Contract and Option Agreement on January 18, 1987. Even if the court considered the letters of December 22, 1986 as part of the evidence, the conclusion on this issue would be no different because of the plain language of the Agreement. Accordingly, the court holds that services rendered by defendant on the Hallbrook project up to January 18, 1987 should be considered in determining defendant's new value defense.

### 2. Total Value of Services Rendered After December 12, 1986

#### a. Mr. Gibbs' Time

The total value of services performed by Continental after December 12, 1986 does not include any time billed by Mr. Gibbs for the following reasons. Gibbs did not keep time sheets but instead kept his time records on a computer that generated his billable time. Defendant did not offer any evidence of the computer-generated time records. Defendant's Exhibit 172 is a December time sheet for Mr. Gibbs but there was no evidence that Exhibit 172 was produced at or near the time the services reflected by the time sheet were performed. Exhibit 172 is not credible evidence of Gibbs' December time.

Gibbs suggested his December time could be determined by a pro rata analysis. Defendant's Exhibit 189 shows Gibbs billed a total of 120 hours to Kroh during December. Although not clearly articulated, Gibbs apparently suggested the court assume an equal number of hours were billed each day and that by dividing his total hours by the number of working days in December, then multiplying that figure by the number of working days after December 12, one could deduce his December hours after those dates. Review of December time sheets for other employees shows the hours billed on any one day ranged from three to 12.5. Accordingly, the court cannot fairly assume that Gibbs' December time would have been billed at an equal number of hours each day.

Alternatively, Gibbs suggested that, at least as to the Hallbrook project, one could assume he worked the same percent of time on that project after December 12 as did his employees. Defendant's Exhibit 189 shows Gibbs billed 98 hours on the Hallbrook Farm project during December, 1986. Again, a review of December time sheets shows several employees worked on the Hallbrook project steadily throughout the month while others worked on it only sporadically. Accordingly, the court can-

not fairly assume that Gibbs' services on the Hallbrook project would have been performed at the same post-December 12 percent as other employees.

Because there is no evidence of the number of hours billed by Gibbs on each project each day in December, 1986 or on the Hallbrook project in January 1987, the findings of total value do not include any of this work performed by Gibbs. The court further finds that in January, 1987, Gibbs worked 4 hours on the 8140 project at a rate of $65.00 per hour and that Kroh was billed for this work. Defendant's Exhibit 161. Because the exact dates worked on projects other than Hallbrook are not necessary to a conclusion concerning new value, the court has included this time in its January total value figure. Finally, based on Defendant's Exhibits 164, 165, and 166, the court finds Gibbs did not bill Kroh for any time worked in February.

b. December Total Value

The December total value of services performed by defendant for Kroh after December 12, 1986 is $24,117.69. This figure includes all the time billed to the Hallbrook project after December 12, 1986. The December total value figure was derived from Exhibit A to defendant's Supplemental Analysis of December New Value filed post-trial and the court's review of December time sheets and Defendant's Exhibit 189. Exhibit A is a summary of time sheets admitted into evidence. Plaintiffs did not object to the figures in Exhibit A in post-trial filings and Exhibit 189 and December time sheets were admitted into evidence at trial.

The court checked the figures in Exhibit A against the December time sheets. Services listed for Dale Albert, Dee Snyder, Phil Francis, Art Miller and Jim Carson as listed in Exhibit A correspond to the time billed as reflected on these individuals' time sheets. The court relied on the hourly rate that the defendant used in reaching the total value figure on Exhibit A.

In reviewing the evidence, the court found discrepancies among Exhibit A, the time sheets, Exhibit 189 and the December invoices on the time billed for David Lotz, Art Miller, Mark Towner, Frank Chelesnik, and Henry Jones. The discrepancies were resolved as follows. Exhibit A did not include two hours billed by David Lotz on December 31, 1986 for the 119th Street project. This work was included on Exhibit 189 and was billed to Kroh on Invoice 2058, Defendant's Exhibit 153. The hourly rate for Mr. Lotz, reflected on Exhibits 189 and 153 was $35.00. The court has included this time in reaching the above figure.

Exhibit A did not include 22.5 hours of time billed by Frank Chelesnik from December 15 through 18, 1986 for the UMKCN project. This work was included on Exhibit 189 and was billed to Kroh on Invoice 2064, Defendant's Exhibit 158. The hourly rate for Mr. Chelesnik, reflected on Exhibits 189 and 158, was $30.00. Accordingly, the court has included this time in reaching the above figure.

The December time sheet for Mark Towner reflects an additional 10.5 hours billed to the 8140 project from December 15 to December 19, 1986. The December time sheet for Henry Jones reflects an additional 8 hours billed to the 8140 project from December 15 to December 30, 1986. None of these hours were billed to Kroh on any of the December invoices in evidence and none were included in Exhibit 189. Accordingly, these hours are not included in the above figure.

The finding of fact as to the total value of services performed by defendant for Kroh during December, 1986, is set forth in the chart below.

TOTAL VALUE OF SERVICES
RENDERED BY DEFENDANT
AFTER DECEMBER 12, 1986

| DATE | PROJECT NAME | VALUE OF SERVICES |
|---|---|---|
| 12–13 | Hallbrook | $ 460.00 |
| 12–15 | UMKCN | 595.00 |
|  | 8140 | 45.00 |
|  | Hallbrook | 1,480.00 |
| 12–16 | UMKCN | 385.00 |
|  | 8140 | 135.00 |
|  | Hallbrook | 1,610.00 |
| 12–17 | UMKCN | 545.00 |
|  | Hallbrook | 1,535.00 |
| 12–18 | UMKCN | 460.00 |
|  | 8140 | 45.00 |
|  | Hallbrook | 1,347.50 |

| DATE | PROJECT NAME | VALUE OF SERVICES |
|------|------|------|
| 12–19 | 8140 | 34.00 |
|  | Hallbrook | 1,502.50 |
| 12–20 | Hallbrook | 1,127.50 |
| 12–21 | Hallbrook | 175.00 |
| 12–22 | 119th | 150.00 |
|  | 8140 | 45.00 |
|  | Hallbrook | 1,717.50 |
| 12–23 | 119th | 180.00 |
|  | WP10 | 60.00 |
|  | Hallbrook | 2,125.00 |
| 12–24 | Hallbrook | 1,595.00 |
| 12–26 | Hallbrook | 405.00 |
| 12–27 | Hallbrook | 1,035.00 |
| 12–28 | Hallbrook | 660.00 |
| 12–29 | 8140 | 65.00 |
| 12–29 | Hallbrook | 1,545.00 |
| 12–30 | Hallbrook | 1,405.00 |
| 12–31 | Hallbrook | 2,578.69 |
|  | 119th | 70.00 |
| **TOTAL** |  | **$24,117.69** |

**c. January Total Value**

The total value of services performed by Continental for Kroh during January, 1987 is $4,892.50. This figure includes all time billed to the Hallbrook project before January 18, 1987.[6] This figure was also derived from January time sheets, Exhibit 189 and January, 1987 invoices.

January time sheets for Henry Jones, Mark Towner, Frank Chelesnik and Jim Carson correspond to the time billed to Kroh as reflected on the January invoices and Exhibit 189. However, the January time sheet for Dee Snyder reflects only 51 hours on the Hallbrook project rather than the 51.5 billed to Kroh and set forth on Exhibit 189, so only 51 hours of her time has been included in the January total value figure.

Dale Albert's January time sheet reflects 73 hours of work on the 8140 Design subproject but there is no corresponding invoice showing the time was billed to Kroh. The time sheet further reflects 8.5 hours of time on the 8140 Special Inspection subproject but 22 hours was billed to Kroh. No explanation of these discrepancies was offered at trial, so none of the time set forth on Dale Albert's January time sheet for the 8140 projects has been included in the January total value figure.

The finding of fact as to the total value of services performed by Continental for Kroh during January, 1987 is set forth in the chart below.

TOTAL VALUE OF SERVICES
RENDERED BY DEFENDANT
FOR JANUARY, 1987

| 01–02 | 8140 | 90.00 |
|------|------|------|
|  | Hallbrook | 520.00 |
| 01–03 | Hallbrook | 150.00 |
| 01–04 | 8140 | 45.00 |
| 01–05 | Hallbrook | 640.00 |
| 01–06 | Hallbrook | 650.00 |
| 01–07 | 8140 | 30.00 |
|  | Hallbrook | 565.00 |
| 01–08 | 8140 | 60.00 |
|  | Hallbrook | 520.00 |
| 01–09 | Hallbrook | 520.00 |
| 01–12 | 8140 | 305.00 |
|  | Hallbrook | 40.00 |
| 01–13 | 8140 | 147.50 |
| 01–14 | 8140 | 270.00 |
| 01–15 | 119th | 80.00 |
|  | 8140 | 142.50 |
| 01–16 | 8140 | 22.50 |
| 01–28 | 8140 | 70.00 |
| 01–29 | 8140 | 45.00 |
| 01–30 | 8140 | 70.00 |
| Gibbs | 8140 | 260.00 |
| **TOTAL** |  | **$5,152.50** |

**d. February Total Value**

The total value of services performed by Continental for Kroh from February 1, 1987 to February 13, 1987, the date Kroh filed bankruptcy, is $220.00, as derived from February time sheets, Exhibit 189 and February, 1987 invoices.

Only the February time sheets for Dee Snyder and Frank Chelesnik correspond to the time billed to Kroh as reflected on February invoices and Exhibit 189. Henry Jones' work for Kroh during this period, as reflected on his February time sheet, was neither listed in Exhibit 189 nor billed on any February invoice admitted into evidence, so none of Henry Jones' February time has been included in the February total value figure. Only 7.5 hours on Mark Towner's February time sheet were billed to Kroh or reflected on Exhibit 189, so only

---

**6.** Defendant has never contended that it should be given new value credit for services performed on the Hallbrook project after January 18, 1987.

7.5 hours of his time has been included in the February total value figure.

Dale Albert's February time sheet reflects 14 hours of work done on the 8140 Special Inspection subproject but 27 hours of his time on that project was billed to Kroh. The invoice on the 8140 Site Utilities subproject reflects 15.25 hours billed to Kroh, but there is no corresponding entry on Albert's time sheet. No explanation of these two discrepancies was offered at trial. Accordingly, none of the time on Dale Albert's February time sheet has been included in the February total value figure.

The finding of fact as to the total value of services performed by Continental for Kroh during February 1987 is set forth in the chart below.

TOTAL VALUE OF SERVICES
RENDERED BY DEFENDANT
DURING FEBRUARY, 1987

| 02–04 | 8140 | 45.00 |
|-------|------|-------|
| 02–05 | 8140 | 100.00 |
| 02–11 | 8140 | 60.00 |
| 02–12 | 8140 | 15.00 |
| TOTAL | | $220.00 |

For the reasons set forth above, the court finds the total value of services authorized by Kroh and rendered by Continental from December 13, 1986 to February 12, 1987 is $29,490.19.

e. Conclusions of Law

Based on previous findings, the court further holds that the total services rendered by Continental on Kroh's behalf from December 13, 1986 to February 12, 1987 constitute new value of $29,490.14. This new value was provided to Kroh in the following amounts and on the following dates:

| RELEVANT DATE | NEW VALUE |
|---------------|-----------|
| 12–13–86 to 12–14–86 | $ 460.00 |
| 12–15–86 | $ 2,120.00 |
| 12–16–86 to 2–13–87 | $26,910.19 |

Gibbs testified and the court finds that none of the December, 1986 or January or February, 1987 invoices were paid by Kroh.

Continental received payment on the Hallbrook, 119th, and 8140 projects from sources other than Kroh. The court further finds that the invoices for December, 1986 and January and February, 1987 on the WP10 project were unpaid. No finding is made as to whether the invoices for these months on the UMKCN project were paid.

Turning to the second issue that arises under defendant's § 547(c)(4) defense and the final issue in this case, the court must consider whether the new value advanced by defendant must remain unpaid. That issue arises under § 547(c)(4)(B). In its entirety, § 547(c)(4) provides that a preferential transfer cannot be avoided if it was:

> to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. § 547(c)(4). Many courts interpreting § 547(c)(4) have found that three requirements must be met: first, the creditor must have extended "new value" as defined in § 547(a)(2); second, the new value must remain unsecured; and third, the new value must go unpaid. *Pettigrew v. Trust Company Bank (Matter of Bishop,* 17 B.R. 180, 183[4] (Bankr.N.D.Ga.1982)). *See also Matter of Prescott,* 805 F.2d 719, 731 (7th Cir.1986); *Erman v. Armco, Inc. (Matter of Formed Tubes, Inc.),* 46 B.R. 645, 646 (Bankr.E.D.Mich.1985). A creditor that raises a "subsequent advance" defense had the burden of establishing these elements. *Prescott,* 805 F.2d at 731.

The Court held above that defendant gave new value of $460.00, $2,120.00, and $26,910.19 during the times mentioned above. Thus, the first element is met. The parties do not contend that the new value was ever secured and therefore the second element—required by § 547(c)(4)(A)—is met.

█ The main dispute in this proceeding regarding the application of § 547(c)(4) concerns whether the third element has been met. Defendant contends that, according to precedent in this jurisdiction, new value does not have to remain unpaid. In support of this contention, defendant relies on *Valley Candle Mfg. Co., Inc. v. Stonitsch (Matter of Isis Foods, Inc.)*, 39 B.R. 645 (W.D.Mo.1984). In that decision district Judge John Oliver held that § 547(c)(4)(B) had no unpaid new value requirement! Plaintiffs, however, contend that the overwhelming majority of cases under § 547(c)(4) hold that the new value must remain unpaid and urge this court to abandon the precedent set forth in Judge Oliver's opinion.

It is true that the majority of courts apply an "unpaid new value" requirement.[7] However, after reviewing the statutory language, the *Isis* decision and the case law from other jurisdictions it appears that Judge Oliver's analysis of the specific facts in *Isis* is correct. Because *Isis* is the precedent in this jurisdiction, the court will follow that decision with one clarifying note.

*Isis* involved a number of preferential transfers followed by a number of advances by the creditor that qualified as new value. Judge Oliver gave the creditor in *Isis* an "offset" for each subsequent shipment of new value even though the debtor had paid for that new value. In doing so, Judge Oliver implicitly recognized that the debtor's payments, which were found to be preferential, were not "otherwise unavoidable" transfers as required by § 547(c)(4)(B).

This court would note only the following. Subsection (B) of 547(c)(4) perceives three different sets of circumstances: 1) a pref-erential transfer followed only by subsequent new value; 2) a preferential transfer followed by subsequent new value and another avoidable transfer on account of the new value; and 3) a preferential transfer followed by subsequent new value and an unavoidable transfer on account of the new value. *Isis*, as does this case, dealt with facts analogous to the second set of circumstances. The court's clarifying note is relevant only to the third set of circumstances. If a transfer made on account of the new value were "otherwise unavoidable," then a creditor could not meet the requirements of § 547(c)(4)(B) and should not get the benefit of the subsequent new value in the form of an offset against the previous preferential transfer. If presented with a factual situation analogous to the third set of circumstances, this court would hesitate to apply the holding in *Isis* that there is no "unpaid new value" requirement. Accordingly, the court holds only that, under the facts presented in this case, there is no "unpaid new value" requirement.[8]

With this issue settled, the court now turns to the specific facts of this case. The relevant findings and conclusions can be summarized as follows:

| RELEVANT DATE | PREFERENTIAL TRANSFER | SUBSEQUENT NEW VALUE |
|---|---|---|
| 12–12–86 | $46,887.34 | |
| 12–13–86 to 12–14–86 | | $ 460.00 |
| 12–15–86 | $10,512.79 | $ 2,120.00 |
| 12–16–86 to 2–13–87 | | $26,910.19 |

Here, defendant has met its burden of proving that it advanced subsequent new value and that any transfer after the advancement on account of the new value

7. *See e.g. Prescott*, 805 F.2d at 731; *In re Ford*, 98 B.R. 669, 681[3] (Bankr.D.Vt.1989); *Global International Airways Corp. v. Evergreen Air Center, Inc. (Matter of Global International Airways Corp.)*, 80 B.R. 990, 992 at n. 4 (Bankr.W.D.Mo.1987) ("The rule of [*Isis*] that the subsequent value may have been paid for and still meet the requirements of § 547(c)(4), seems contrary to common sense and the clear intent of the statute and has been rejected by subsequent authority."); *In re International Airways, Inc.*, 56 B.R. 551, 554–55[2] (Bankr.E.D.Pa. 1986); *Formed Tubes*, 46 B.R. at 646; *Keydata*

*Corporation v. Boston Edison Company (In re Keydata Corp.)*, 37 B.R. 324, 328[10] (Bankr.D.Mass.1983); *Bishop*, 17 B.R. at 183[4]. *See also Rovzar v. Chemical Sales and Service Co. (In re Saco Local Development Corp.)*, 30 B.R. 862, 866[5] (Bankr.D.Me.1983).

8. For this reason, the court does not need to reach the issue whether new value is considered unpaid if paid for by a party other than the debtor.

was not "otherwise unavoidable." Accordingly, the court holds that defendant is entitled to its defense under § 547(c)(4) and may offset the entire amount of the new value, totaling $29,490.00 from the preferential transfers of $46,887.34 and $10,-512.79 in the following manner:

| RELEVANT DATE | PREFERENTIAL TRANSFER | SUBSEQUENT NEW VALUE | NET PREFERENCE |
|---|---|---|---|
| 12–12–86 | $46,887.34 | | $46,887.34 |
| 12–13–86 to 12–14–86 | | $ 460.00 | $46,887.34 (460.00) |
| | | | $46,427.34 |
| 12–15–86 | $10,512.79 | $ 2,120.00 | $46,427.34 10,512.79 |
| | | | $56,940.13 (2,120.00) |
| | | | $54,820.13 |
| 12–16–86 to 2–13–87 | | $26,910.19 | $54,820.13 (26,910.19) |
| | | | $27,909.94 |

Based on the above, the court further holds that $27,909.94 of the two transfers remains preferential and that plaintiffs may recover that amount.

For the reasons set forth above, it is ORDERED, ADJUDGED and DECREED as follows:

1. That defendant's Motion to Amend the Evidence, filed January 29, 1989, is granted.

2. That judgment shall be entered in favor of plaintiffs for $27,909.94, together with interest at the legal rate after March 24, 1988.

3. Costs shall be paid by defendant.