In re THOMAS W. GARLAND, INC., Debtor.

THOMAS W. GARLAND, INC., Plaintiff,

v.

UNION ELECTRIC COMPANY, Defendant.

Bankruptcy No. 81–01175(1).

Adv. No. 81–0257(1).

United States Bankruptcy Court, E. D. Missouri, E. D.

May 5, 1982.

A. Thomas DeWoskin, Clayton, Mo., for plaintiff.

Claiborne P. Handleman, St. Louis, Mo., for defendant, Union Elec. Co.

## MEMORANDUM OPINION

ROBERT E. BRAUER, Bankruptcy Judge.

Pending for disposition is a Complaint filed by the Plaintiff, Thomas W. Garland, Inc., a Debtor-in-Possession in a Chapter 11 liquidation proceeding. In its Complaint Plaintiff alleges that certain payments made by it to the Defendant, Union Electric Company, during the ninety days preceding the filing of its Bankruptcy Petition constitute preferential transfers as defined in 11 U.S.C. § 547(b) and prays for an order requiring the turnover to the Debtor-in-Possession of these alleged preferential transfers pursuant to 11 U.S.C. § 547(b) and 11 U.S.C. § 1107(a). In its Answer the Defendant, Union Electric Company, admits receipt of certain payments made by the Debtor-in-Possession during the ninety days preceding the filing of the Debtor's Bankruptcy Petition, but denies that these payments constitute preferential transfers within the definition of a preferential transfer as set forth at 11 U.S.C. § 547(b). In the alternative, Union Electric alleges that, if this Court finds the transfers to be preferential transfers, these transfers are not voidable by the Debtor-in-Possession as the transfers fall within exceptions to the avoiding powers of the Debtor-in-Possession set forth at 11 U.S.C. § 547(c)(2) and 11 U.S.C. § 547(c)(4). Trial was had on August 17, 1981, with leave to the parties to file briefs.

The Debtor-in-Possession (Garland's) operated seven retail clothing stores in the St. Louis metropolitan area. The Defendant (Union Electric) provided electrical service to Garland's at all seven locations plus

steam service at one location, so that eight separate running accounts were maintained between Garland's and Union Electric.

Union Electric provided electrical and steam service to Garland's on a continuing basis. The kilowatts of electricity and pounds of steam furnished by Union Electric were recorded on meters which were read periodically, approximately every thirty days. Individual billing statements were prepared based on the amounts of electricity or steam consumed (as determined by the meter reading) and then mailed to Garland's for payment. The exhibits reflect that the billing statements were prepared and mailed approximately seven days after the end of the approximately thirty-day service period. Garland's normally paid these utility bills by mailing a check to Union Electric sometime after receipt of the billing statement. Several weeks typically elapsed between the time a billing statement was mailed to Garland's and payment was remitted to Union Electric. This delay in payment has prompted Garland's, as a Debtor-in-Possession, to challenge the payments made to Union Electric as preferences within the definition in the Bankruptcy Code.

Union Electric relies primarily on an application of the judicially created "net result rule" in its denial that the payments received from Garland's were preferential transfers under 11 U.S.C. § 547(b). The net result rule provides as follows:

> When, for goods sold and delivered, payments are made on a running or open account between the parties in the regular course of business within the 90-day period, without the knowledge on the part of the creditor of the debtor's insolvency, and the net result of these transactions is to enrich the debtor's estate by the total sales, less the total payments,

such payments or transfers are not preferential, even though no corresponding goods are exchanged for the payments made within 90 days before bankruptcy. It was said that if the net result were in favor of the creditor, then a preference was effected to that extent.

4 Collier on Bankruptcy § 547.40, at 547–125, 126. (15th ed. 1981). Union Electric asserts that the value of the utilities supplied by Union Electric to Garland's during the 90-day preference period exceeded the amount of Garland's payments to Union Electric during this same period, the net result being an increase in the value of the bankruptcy estate. Therefore, according to Union Electric, the payments to it do not enable Union Electric to receive more than it would receive if the transfers had not been made,[1] because, if such transfers had not been made, Union Electric would not have provided further utility services and the bankruptcy estate would not have been enriched to the extent of the value provided by Union Electric in the form of those additional utility services.

The net result rule developed originally as a result of judicially perceived inequities in the Bankruptcy Act of 1898. Section 60(a) of the Bankruptcy Act of 1898 defined a preference as a transfer of property by a debtor to his creditor which would enable that creditor to obtain a greater percentage of his debt than other creditors. Section 60(b) provided a remedy for recovery of a preferential transfer. The preferential transfer could be avoided by the Trustee and the property or its value recovered, provided, however, that the creditor had reason to believe a preference was intended.

In 1901, in the case of *Pirie v. Chicago Title & Trust Co.*, 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171 (1901), the United States Su-

---

1. 11 U.S.C. § 547(b)(5) sets forth the final element in the definition of a preference, that is, that the payment must enable the creditor to receive a greater percentage of its claim than it would receive under the distributive provisions of the bankruptcy code. Union Electric would have the net result rule appended to § 547(b)(5) since § 547(b)(5) is the successor to that portion of § 60(a) of the Bankruptcy Act which required the allegedly preferred

creditor to receive, as a result of the transfer, a greater percentage of its claim than other creditors of the same class. *Waldschmidt v. Ranier (In re Fulghum Construction Co.)*, 7 B.R. 629 (Bkrtcy.M.D.Tenn.1980), aff'd, 14 B.R. 293 (Bkrtcy.M.D.Tenn.1981), so holds, a holding criticized by Bkrptcy. J. Norton in *Pettigrew v. Trust Company Bank (In re Bishop)*, 17 B.R. 180, 8 B.C.D. 852, 856 (Bkrtcy.N.D.Ga.1982).

preme Court was called upon to interpret Section 57(g) of the Act which mandated that "the claims of creditors who have received preferences shall not be allowed unless such creditors shall surrender their preferences." The creditor, Carson, Pirie, Scott & Company, received a preferential payment, as defined in section 60(a), which reduced the bankrupt's outstanding debt to Carson's. However, because Carson's had no knowledge of the bankrupts' insolvency and no reasonable cause to believe the payment was intended to be a preference, the preferential payment was not voidable under section 60(b) by the Trustee, Chicago Title and Trust Company.

In a 5–4 decision, the Supreme Court interpreted section 57(g) literally to require the surrender of *all* preferences, voidable as well as non-voidable or technical, before a preferred creditor's claim would be allowed. Carson's was given the option of retaining its technical preferential payment and foregoing any participation in a distribution of assets by the Trustee, or, returning the technical preference and participating with other creditors in any distribution made by the Trustee.

Subsequently, in running account cases, several courts attempted to alleviate this seemingly harsh result by holding that certain payments made to a creditor within four months of bankruptcy were *not preferences* as defined in section 60(a). In *Kimball v. E. A. Rosenham Co.*, 114 F. 85 (8th Cir. 1902), the Eighth Circuit Court of Appeals held that

> The receipt by a creditor of payments upon an account current, in the usual course of business, which are followed by new credits for property delivered to the debtor, which becomes a part of his estate, for which the creditor has not been paid, and which equals or exceeds in amount and value the payments, does not constitute a preference, under section 60a, and does not require the creditor to surrender such payments as a condition of the allowance of his claim, under section 57g of the bankrupt act of 1898.

*Id.* at 88, 89. The Court in *Kimball* reasoned that the payments and subsequent credits on the running account must be considered as parts of the same transaction because of their mutual interdependence and relation. Common business practice, purpose, and motive could not be ignored:

> The customary and natural effect of payments upon a live account current is the continuance of the account and the extension of new credits. Stop payments upon such an account, and new credits are not extended, and the account closes. Make payments, and the account continues and further credit is given. The payments upon the old credits constitute the inducement for the extension of new credits, without which these credits would not be made.

*Id.* at 87. Because the value of the new credits on the running account exceeded the value of the payments on the account, such payments did not, in the words of section 60(a), "enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class." *See also, Dickson v. Wyman*, 111 F. 726 (1st Cir. 1901); *In re Sagor & Brother*, 9 Am.Bankr. Rep. 361 (2d Cir. 1903); *Gans v. Ellison*, 114 F. 734 (3d Cir., 1902).

The United States Supreme Court, citing the decisions by the courts in *Kimball, Dickson, Sagor,* and *Gans,* confirmed the validity of the net result rule in *Jaquith v. Alden*, 189 U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717 (1903). In *Jaquith v. Alden*, the court held that "payments on a running account, where new sales succeed payments and the net result is to increase the value of the estate, do not constitute preferential transfers under section 60(a)." 189 U.S. at 83. The Supreme Court reaffirmed its decision in *Jaquith v. Alden* in *Yaple v. Dahl-Millikan Grocery Co.*, 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776 (1904) and *Joseph Wild & Co. v. Provident Life & Trust Co.*, 214 U.S. 292, 29 S.Ct. 619, 53 L.Ed. 1003 (1909).

In 1903 Congress amended section 57(g) of the Bankruptcy Act, reducing its application to void or voidable preferences.[2] The

---

2. Ch. 487, § 12(g), 32 Stat. 799 (1903).

recipient of a technical preference, that is, one who took without knowledge of a debtor's insolvency, was no longer required to surrender the preference before his claim would be allowed. This amendment would seem to have eliminated the theoretical foundation for the net result rule. However, some courts continued to apply the rule in an effort to obtain equitable results in certain cases. E.g., *Federal International Banking Co. v. Childs (In re Fred Stern & Co., Inc.)*, 54 F.2d 478 (2d Cir. 1931); *Walker v. Wilkinson*, 296 F. 850 (5th Cir. 1924); *Wilson v. Kanter (In re Marley-Morse Co.)*, 275 F. 832 (7th Cir. 1921); *In re Stewart*, 233 F.Supp. 89 (D.Ore.1964). *Contra: Cooper Petroleum Co. v. Hart*, 379 F.2d 777 (5th Cir. 1967); *Shaw v. Walter Heller & Co.*, 385 F.2d 353 (5th Cir. 1967); *Campanella v. Liebowitz (In re Peter Cassinelli Macaroni Co.)*, 103 F.2d 252 (3d Cir. 1939).

The most recent discussion and application of the net result rule in the Eighth Circuit occurred in *Farmers Bank of Clinton v. Julian*, 383 F.2d 314 (8th Cir. 1967) cert. denied, 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967), which was decided under the Bankruptcy Act. In this case, the debtor, Roby C. Woody, d/b/a Woody Motor Company, operated a franchised automobile dealership and utilized the financial services of Farmers Bank of Clinton as well as the services of several other banks and the large automobile financing institutions of GMAC, Commercial Credit Corporation, and possibly C.I.T. On May 12, 1959, approximately two months prior to bankruptcy and during the preference period, Woody borrowed $12,000 from the Farmers Bank of Clinton and signed a seven-day note,[3] telling the lending officer that he (Woody) required the funds for operating capital until he could procure a major loan from Commercial Credit Corporation. By June 3, 1959, Woody had repaid $9000 of the $12,000 loan leaving an outstanding balance of $3000. On June 3, Woody signed a new demand note with Farmers Bank for $16,000, $3000 of which was used to pay off the

note signed on May 12, 1959, and $13,000 of which was deposited into Woody's account.

A representative from Commercial Credit Corporation was scheduled to visit Woody's business on or about June 23, 1959, to finalize Woody's application for a major operating loan. When the representative from Commercial Credit Corporation postponed his appointment for one week, the Bank agreed to cooperate with Woody during the interim. On June 30, 1959, the representative from Commercial Credit Corporation, Woody, and an officer of Farmers Bank met at Woody's place of business. The representative from Commercial Credit Corporation stated that Commercial Credit would not make a loan until it had a detailed audit of Woody's operation. The bank officer then decided that Commercial Credit would not make the long term operating loan. He returned to the Bank and exercised the Bank's right of set off applying the $9733.88 then in Woody's bank account to the $16,000 demand note. On July 9, 1959, Woody made an assignment for the benefit of creditors. An involuntary petition in bankruptcy was filed on July 13, 1959.

The Trustee attacked Woody's repayment of the May 12th loan of $12,000 as a preferential transfer. The Referee sustained the Trustee's challenge and the United States District Court affirmed, holding that the payments were preferences as they were made while the Bank had actual knowledge of the Debtor's insolvency or reasonable cause to believe the debtor was insolvent. The Eighth Circuit Court of Appeals reversed the findings of the Bankruptcy Court and the District Court, and held that "as the Trustee did not carry his burden of proving that the Bank knew or had reasonable cause to believe that Woody was insolvent at the time of the payments, these preferences were not voidable under the Act and not subject to the Referee's turnover order." 383 F.2d at 327.

However, the Eighth Circuit did not stop with this finding. The Court continued by

---

**3.** Only those facts and issues relative to the Eighth Circuit's discussion of the net result rule will be discussed herein. The bank had made other loans to the bankrupt; these other loans and related issues were also decided by the appellate court.

stating, "However, even if it could be said that the Bank had reasonable cause to believe the debtor was insolvent, we do not believe these payments could be considered preferences under § 60(a) of the Act." *Id.* at 327. Under the Bankruptcy Act, when a creditor was found to have accepted payments during the preference period with knowledge of the debtor's insolvency, the creditor was required to turnover such payments to the Trustee unless the creditor could qualify under any exception to avoidability found in section 60. The Court found that section 60(c)[4] was applicable and provided partial relief to the Bank. The Court stated that to the extent section 60(c) achieved the goal of the preference provisions, that is, "to secure an equal distribution of the bankrupt's assets among his creditors of like class," section 60(c) should be applied. *Id.* at 327. But because section 60(c) did not provide complete relief to the creditor,[5] the Court resorted to an application of the net result rule under section 60(a) to achieve what the court considered to be an equal distribution of assets.

If *Farmers Bank of Clinton v. Julian* had arisen under the Bankruptcy Code, after October 1, 1979, the Court could have reached the same result without resorting to an application of the net result rule. Section 60(c) of the Bankruptcy Act was the predecessor to Section 547(c)(4) of the Bankruptcy Code, and section 60(c) was substantially rewritten in section 547(c)(4). Among other revisions, the language "the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy," was deleted. Therefore, Farmers Bank could have set off the entire $16,000 new value advance against the $12,000 preferential payment. The timing of the set off of the funds in the bank account would not have affected the outcome. The case is illustrative of the various applications of the net result rule under the Bankruptcy Act and in the context of both 60(a) and 60(c).

■ The parties have placed in issue whether or not the net result rule is still applicable under the new Bankruptcy Code, and, if a viable doctrine, whether it shall be appended to section 547(b)(5) or section 547(c)(4). The legislative history related to section 547(b)(5) does not mention the net result rule. The legislative history related to section 547(c)(4) refers to the net result rule briefly and provides as follows:

> The fourth exception [547(c)(4)] codifies the *net result rule* in section 60c of current law. If the creditor and the debtor have more than one exchange during the 90-day period, the exchanges are netted out *according to the formula in paragraph (4)*. Any new value that the creditor advances must be unsecured in order for it to qualify under this exception. (emphasis added).

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 374, *reprinted in* [1978] U.S.Code Cong. & Ad.News 5787, 6330; S.Rep. No. 95–989, 95th Cong., 2d Sess. 88, *reprinted in* [1978] U.S.Code Cong. & Ad.News 5874. Although Congress states in the foregoing legislative history that section 547(c)(4) "codifies the net result rule," a comparison of this code section with the net result rule, as originally propounded by the courts in *Jaquith, Yaple, Joseph Wild & Co., et al,* demonstrates that this was simply not accomplished. Although some courts applied the net result rule when section 60(c) did not provide adequate relief, a study of the

---

**4.** Section 60(c), 11 U.S.C. § 96(c), provided: If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, *the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy* may be set off against the amount which would otherwise be recoverable from him. (emphasis supplied).

**5.** Because the Bank exercised its right to set off the balance in Woody's bank account ($9733.88) against the $16,000 demand note

prior to the date of adjudication in bankruptcy, the amount of new value remaining unpaid on the date of bankruptcy was not sufficient to offset the entire $12,000 preference. Whereas, if the Bank had waited until after the date of adjudication in bankruptcy to exercise its right of set off, the entire $16,000 in new value would have been available as an offset against the $12,000 preference. The Bank could have retained the $12,000 in preferential payments, set off the funds in Woody's bank account against the remaining unpaid balance on Woody's debt, and filed a claim for the remainder.

case law development of the net result rule indicates that the rule did not originate from section 60(c) of the Bankruptcy Act. Rather, the rule was an adjunct to section 60(a) of the Act, developed in response to a strict interpretation of section 57(g) of the Act as section 57(g) existed prior to 1903. Congress could have drafted section 547(c)(4) to read:

> The trustee may not avoid under this section a transfer to or for the benefit of a creditor, *to the extent that, on or with-in 90 days before the date of the filing of the petition,* such creditor gave new value to or for the benefit of the debtor...

which language would have codified the net result rule. Because the net result rule was not codified in the language of the new Bankruptcy Code and because the courts were in general disagreement about the rule and its application under the old Act, it is impossible to ascribe more than a general intent on the part of Congress to retain the concept of the net result rule in current law. An acknowledgement of the net result rule in the legislative history serves to emphasize that the drafters of the Code were attempting to retain at least the principles behind the rule in section 547(c)(4) and to recognize the realities of ordinary business transactions. Section 547(c)(4) serves the general goals of the preference provisions of the Code. A creditor is encouraged to cooperate with a financially troubled debtor and is protected to the extent that he extends new credit in reliance on prior payments. Unusual action by either a creditor or a debtor is discouraged.

Whatever the net result rule may have been under the prior Bankruptcy Act, Congress has indicated that, under the Bankruptcy Code, the rule is to be applied *according to the formula set forth in section 547(c)(4)*. A creditor who has received a preferential transfer may retain that transfer to the extent that, *after such transfer,* such creditor gave new value to or for the benefit of the debtor. I cannot accept Union Electric's argument that section 547(c)(4) incorporates the net result rule as originally propounded by the United States

Supreme Court in *Jaquith v. Alden, Yaple v. Dahl-Millikan Grocery Co.,* and *Joseph Wild & Co. v. Provident Life & Trust Co.* And, such is the conclusion of Bankruptcy Judge Norton, in *In re Bishop,* supra (fn. 1, p. 922).

Union Electric suggests also that section 547(b)(5) be found to have incorporated the net result rule, since section 547(b)(5) is the successor to the greater percentage test of section 60(a) to which the net result rule was originally appended. To read the net result rule into section 547(b)(5) would completely eliminate the usefulness of section 547(c)(4). I can think of no set of facts where, if the net result rule were to be applied under section 547(b)(5), 547(c)(4) would ever be utilized. Section 547(c)(4) would not have been included in the Bankruptcy Code if the drafters did not envision some application of that section. I hereby hold that Congress did not intend to incorporate the net result rule into section 547(b)(5).

The Debtor-in-Possession, Garland's, urges that section 547(c)(4) be interpreted to allow set off only of new value provided immediately after one preferential transfer and prior to the next preferential transfer. I hereby reject Garland's suggested interpretation of section 547(c)(4). Such an interpretation places limitations on the creditor's right of set off not found in the statutory language. In addition, this suggested interpretation, if applied, would be tantamount to treating the preferential transfer and subsequent unsecured advances as a substantially contemporaneous exchange, coverage of which is already provided for in section 547(c)(1).

All of the payments made by Garland's to Union Electric and challenged by Garland's are preferential transfers as defined in section 547(b) of the Bankruptcy Code. Therefore, it must be determined whether any of the challenged preferential payments are excepted from the Trustee's (Debtor-in-Possession) avoiding power under any subsection of section 547(c). Union Electric asserts that several payments are excepted under section 547(c)(2).[6]

---

6. 11 U.S.C. § 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer——

To determine whether the preferential transfers fall within the section 547(c)(2) exception to avoidability, two issues must be resolved: (1) When were the debts "incurred?" and (2) on what dates were the preferential transfers made?

■ It must first be determined when the debt was "incurred," as the transfer cannot have been made "later than 45 days after the debt was incurred" to fall within the 547(c)(2) exception. A case on point is *Bass v. Southwestern Bell Telephone Company, (In re Ray W. Dickey & Sons, Inc.)*, 11 B.R. 146 (Bkrptcy.N.D.Tex.1980), in which the Trustee filed a complaint seeking to avoid a payment made by the Debtor to the telephone company during the 90-day preference period. The telephone company asserted that the 547(c)(2) exception applied. The only issue in the case is when the debt to the telephone company was incurred for purposes of the 547(c)(2) exception. "The testimony at the trial reflected that the billing date, or cut off date, for debtor's bill was the 13th of each month. The actual bill was rendered approximately ten days after that cut off date and the due date was at least fifteen days after the issuance of the bill." *Id.* at 147. The Bankruptcy Judge held, citing *Collier on Bankruptcy* (15th Edition) as his authority, that the debt "was 'incurred' *prior to* the cut off date," a date more than 45 days prior to the date of payment.[7]  *Id.* at 148 (emphasis supplied).

Garland's would have this Court adopt the position taken by Collier's and the Tex-

as Bankruptcy Court in Dickey, that is, "when a debtor uses a utility the debt is incurred at the time the resource is consumed rather than when the invoice is sent." 4 Collier on Bankruptcy § 547.38 at 547–121 (15th ed. 1981). However, this position presents practical problems when applied to a utility supplying electricity and steam. The task of identifying or measuring when each kilowatt of electricity or pound of steam is consumed is a practical impossibility as this utility consumption continues twenty four hours per day. Neither Garland's nor Union Electric has maintained business records purporting to show how much electricity or steam was consumed by Garland's during any given hour or day or week.

■ The 547(c)(2) exception applies only to debts incurred in the ordinary course of business of the debtor and the transferee. In the absence of specific statutory or legislative guidance to the contrary,[8] the ordinary and established business customs of the creditor and debtor should be considered in determining when the debt was incurred. The court should not require unnecessarily the parties to rearrange their accounting practices and financial dealings with one another. The legislative history provides that the purpose of the section 547(c)(2) exception is to "leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the

(2) to the extent that such transfer was—
(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made not later than 45 days after such debt was incurred;
(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(D) made according to ordinary business terms.

**7.**  4 Collier on Bankruptcy § 547.38 at 547–121 (15th ed. 1981) provides:
The determination of when a debt is actually "incurred" is critical. One view is that the debt is not incurred until an invoice is sent or demand for payment is made. The probably better view is that the debt is incurred when-

ever the debtor obtains a property interest in the consideration exchanged giving rise to the debt. Thus if goods are identified for shipment, unless the special agreement otherwise provides, the debtor has a special property interest and the debt is "incurred". Certainly when a debtor uses a utility the debt is incurred at the time the resource is consumed rather than when the invoice is sent. Thus in the above example, unless the utility bill is sent and paid within a short time, there is a significant probability that payment of the utility bill will be made more than 45 days after the debt is incurred.

**8.**  Except in a tax context, the legislative history is silent as to when a debt is incurred for purposes of section 547(c)(2).

debtor's slide into bankruptcy." H.R.Rep. No.95–595, 95th Cong., 1st Sess. 373–374 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin. News 1978, 6329. The established business practice between Garland's and Union Electric was to measure the utility usage at intervals of approximately thirty days. To comport with the language of section 547(c)(2) and the legislative history, I hold that each debt was incurred on the last day of the approximately thirty-day service period, on the date (the cut-off date) the utility meter was read.[9]

■ The second issue which must be resolved before it can be determined whether any of the challenged preferential payments fall within the section 547(c)(2) exception is, "On what dates were the preferential payments actually made?" Garland's made all save one of the challenged payments to Union Electric by means of checks drawn on Garland's corporate accounts. (See Plaintiff's Exhibits 1–4 and 6–10). One payment to Union Electric was made by means of a cashier's check purchased by Garland's from First National Bank in St. Louis. (See Plaintiff's Exhibit 5). Garland's alleges that the preferential payments were made, for purposes of section 547(c)(2), on the dates the checks were finally paid by the payor bank. Union Electric asserts that the preferential payments were made on the dates the checks were received by Union Electric. The legislative history on this issue is clear and supports Union Electric's position.

> Contrary to language contained in the House report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored.

Payment is considered to be made when the check is delivered for purposes of sections 547(c)(1) and (2).[10]

I hold, for purposes of calculating the 45-day period as set forth in section 547(c)(2)(B) and in accord with the facts of this case, that the 45-day period began on the date a utility meter was read (the cut-off date) and ended on the date a check for payment was received by Union Electric, so long as that check was not dishonored subsequently.

■ I hold also that the date of transfer, within the context of section 547(c)(4), occurs on the date a payment by check is received by a creditor, so long as the check is not dishonored. I am not persuaded by Garland's argument that section 547(e), which speaks in terms of "perfection" of a transferee's interest, dictates otherwise.

■ Applying the foregoing discussion to the facts *sub judice*, I find that two of Garland's payments and part of a third payment fall within the section 547(c)(2) exception to avoidability of a preferential transfer: Garland's check for $1,058.95 (Plaintiff's Exhibit 1) in payment of a bill for service supplied between December 20, 1979, and January 23, 1980, received by Union Electric on March 3, 1980, forty days after the cutoff date; Garland's check for $1031.22 (Plaintiff's Exhibit 10) in payment of the current portion of a bill for service supplied between February 21, 1980, and March 24, 1980, received by Union Electric on May 7, 1980, forty-four days after the cutoff date; and $731.24 of Garland's check for $2321.90 (Plaintiff's Exhibit 4)[11] in payment of the current portion of a bill dated

9. The result of this case will not change whether the debt was incurred at the moment service was furnished, or as of the cut-off date, or as of the billing date.

10. Statement by the Hon. Don Edwards, Chairman of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, upon introducing the House Amendment to the Senate Amendment to H.R. 8200, September 28, 1978, 124 Cong.Rec. H 11089, *reprinted in* [1978] U.S.Code Cong. & Ad.News 6457.

Statement by the Hon. Dennis DeConcini, Chairman of the Subcommittee on Improvements of Judicial Machinery of the Senate Committee on the Judiciary, upon introducing the Senate Amendment to the House Amendment to H.R. 8200, October 6, 1978, 124 Cong. Rec. S 17406, *reprinted in* [1978] U.S.Code Cong. & Ad.News 6526.

11. Garland's check for $2321.90 (Plaintiff's Exhibit 4) was in payment of bills on six of its accounts with Union Electric. Garland's allocated $731.24 for the current portion only of the 7608 Forsyth bill dated March 3, 1980.

March 3, 1980, for service supplied between January 24, 1980, and February 26, 1980, received by Union Electric on April 9, 1980, forty-three days after the cutoff date.

The remaining payments made by Garland's to Union Electric fall within the section 547(c)(4) exception to avoidability of preferential transfers.[12] The payment of $1801.21 on March 26, 1980 (Plaintiff's Exhibit 3), was followed by the provision of additional utility service in the total amount of $8073.73. This additional service was provided on an unsecured basis [547(c)(4)(A)], and no portion of the service was used to offset any otherwise unavoidable transfer [547(c)(4)(B)]. All utility service which related to those payments not avoidable by reason of the application of section 547(c)(2) was provided by Union Electric prior to March 26, 1980. The payment of $1436.80 on March 27, 1980 (Plaintiff's Exhibit 2), was followed by the provision of additional utility service in the total amount of $7928.87. The remaining balance of $1590.66 on the payment of $2321.90 (Plaintiff's Exhibit 4) on April 9, 1980, was followed by additional utility service totaling $6221.28. The payment of $1011.05 (Plaintiff's Exhibit 5) on April 15, 1980, was followed by additional utility service totaling $5312.80. The payment of $421.85 (Plaintiff's Exhibit 6) on May 6, 1980, was followed by additional utility service in the amount of $2459.55. Finally, the payments of $449.72 (Plaintiff's Exhibit 7) and $209.72 (Plaintiff's Exhibit 8) and $356.42 (Plaintiff's Exhibit 9) on May 15, 1980, were followed by additional utility service totaling $1676.49.

Each payment was followed by the extension of new credit in a sum in excess of the amount of the challenged payment, *and*, the total new value extended ($8073.73) is greater than the sum of the challenged preferential payments ($7277.48). This final criteria is not a reiteration of the net result rule, but rather, is a check necessary to assure compliance with the provisions of section 547(c)(4)(B). Each dollar of the preferential payment may be set off against each dollar of new value, but the set off may not be greater than dollar for dollar. Therefore, Union Electric Company is entitled to retain all payments made to it by Thomas W. Garland, Inc., during the ninety days preceding the filing of Garland's petition in bankruptcy.

Accordingly, a separate judgment is being entered this date, on this Complaint, in favor of the Defendant, Union Electric Company.

---

**12.** 11 U.S.C. 547(c)(4) provides:

(c) The trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.