**In re IRFM, INC., a California corporation, formerly dba Irvine Ranch Farmers Market, Debtor.**

**Robert P. MOSIER, Chapter 7 Trustee, Plaintiff,**

v.

**EVER–FRESH FOODS COMPANY, Defendant.**

**Bankruptcy No. SA 88–04423 JR.
Adv. No. SA 91–3920 JR.**

United States Bankruptcy Court, C.D. California.

Sept. 4, 1992.

---

Michael G. Spector, Fabozzi, Prenovost & Normandin, Santa Ana, Cal., for plaintiff.

Gerald Lee Bolinger, Santa Ana, Cal., for defendant.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

Chapter 7 Trustee ("Trustee") filed a complaint to recover payments made to Ever–Fresh Foods Company ("Creditor") by IRFM, Inc. ("Debtor"). Trustee alleges nearly half the payments are avoidable under Bankruptcy Code ("Code") § 547(b). Creditor alleges all of the payments qualify for a new value defense under Code § 547(c)(4). Trustee argues that § 547(c)(4)(B) requires new value to remain unpaid. Both parties moved for summary judgment. After a hearing on June 15, 1992, I took the matter under submission.

## JURISDICTION

Jurisdiction over this adversary proceeding exists pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district), and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

## FACTS

Debtor operated a chain of grocery stores. Creditor supplied cheese and other dairy goods to Debtor and invoiced Debtor for each delivery. Invoice terms indicated full payment "net 7 days."

On July 22, 1988, Debtor filed a voluntary petition under Chapter 11 of the Code. The case was later converted to Chapter 7.

Within 90 days of Debtor's petition (the "preference period"), Creditor received nine checks from Debtor totalling $163,-267.24. After the first check dated April 25, 1988, Creditor shipped goods to Debtor totalling $276,008.47.

All payments were for goods previously shipped. However, the evidence does not specify the dates payments or deliveries

were actually received. Evidence does show Debtor holding checks several days before delivering them to Creditor.

Creditor supplied Debtor with goods on roughly a daily basis throughout the preference period, as depicted in the table below:

| Check Date | Check Amount | Goods Shipped |
|---|---|---|
| April 25 | $ 18,475.86 | |
| | | $ 18,849.16 |
| May 2 | $ 18,095.66 | |
| | | $ 33,063.18 |
| May 11 | $ 16,197.93 | |
| | | $ 16,197.93 |
| May 16 | $ 14,492.91 | |
| | | $ 17,280.78 |
| May 23 | $ 18,056.21 | |
| | | $ 20,590.11 |
| May 30 | $ 18,420.07 | |
| | | $ 23,056.79 |
| June 6 | $ 18,922.37 | |
| | | $ 17,436.51 |
| June 13 | $ 23,479.03 | |
| | | $ 15,967.54 |
| June 20 | $ 17,127.20 | |
| | | $113,566.47 |
| July 22 | | |
| TOTALS: | $163,267.24 | $276,008.47 |

The right column indicates the value of goods supplied between the dates of each check.

In response to Trustee's interrogatory, Creditor admitted that $90,372.07 of goods shipped after April 25 remained unpaid.

Trustee seeks recovery of $72,895.17, asserting preferential transfers of $163,-267.24 and admitting a § 547(c)(4) defense of $90,372.07.

Creditor asserts a complete new value defense under § 547(c)(4). Alternatively, Creditor asserts defenses under Code § 547(c)(1), a transfer for a contemporaneous exchange of new value, and Code § 547(c)(2), a transfer in the ordinary course of business.

### DISCUSSION

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56 applicable in bankruptcy cases. The latter rule provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

██ Trustee bears the burden of establishing [1] the five elements of a § 547(b) preference: [2] (1) the debtor made a trans-

---

1. Section 547(g) provides:

(g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the

burden of proving the nonavoidability of a transfer under subsection (c) of this section.

2. Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

fer to a creditor; (2) for an antecedent debt; (3) while the debtor was insolvent; (4) during the 90 days before the petition; (5) allowing the creditor to receive more than it would under a Chapter 7 liquidation.

Trustee has established the five § 547(b) elements. No issue was raised with respect to elements (1), (2), and (4). Element (5) was satisfied because any payment to a general unsecured creditor during the preference period necessarily favors that creditor if a Chapter 7 liquidation would yield less than a 100 percent distribution. *In re Lewis Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir.1985). Trustee's accountant testified that unsecured creditors would recover a 15 percent maximum distribution under a Chapter 7 liquidation. Creditor offered no rebuttal evidence.

■ Debtor's insolvency (element 3) is disputed. Debtor's pre-petition financial statements (the "statements") show Debtor having a considerable stockholders' equity for the years ending November 30, 1986, and November 27, 1987.[3] Trustee's accountant asserted that the statements were unreliable, that Debtor was insolvent after November 30, 1986, and that Debtor had a large adjusted stockholder's deficit on November 29, 1987.[4]

Trustee's burden of establishing insolvency is eased by Code § 547(f), which establishes a presumption of Debtor's insolvency during the preference period.[5] In the Ninth Circuit, "the mere assertion that the debtor is solvent will not suffice." *In re World Financial Services*, 78 B.R. 239, 241 (9th Cir. BAP 1987) (citing *In re Candor*, 68 B.R. 588 at 593–94 (Bankr.S.D.N.Y. 1986)). In *World*, the court held that "unaudited and pre-transfer financial statements did not rebut the presumption" of § 547(f). *Id.* (citation omitted). Creditor's evidence of an unaudited financial statement dated five months before the preference period fails to overcome the § 547(f) presumption.

■ After establishing that the transfers were preferential, § 547(g) shifts the burden to Creditor to establish one of the § 547(c) defenses. Creditor's principal defense is under § 547(c)(4).[6]

■ Trustee argues that Creditor must prove three elements to establish a § 547(c)(4) defense: (1) post-preference new value; (2) that is unsecured; and (3) remains unpaid.[7] Creditor responds that

---

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

3. The statements indicate a stockholders' equity of $4,103,991.00 on November 30, 1986 (an audited statement), and $5,897,193.00 on November 29, 1987 (an unaudited statement).

4. Trustee's accountant indicates an adjusted stockholders' deficit of $5,948,156.00 on November 29, 1987.

5. Code § 547(f) provides:

(f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

6. Section 547(c)(4) provides:

(c) The trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

7. In support, Trustee cites: *In re Jet Florida System, Inc.*, 841 F.2d 1082, 1083 (11th Cir. 1988); *Matter of Prescott*, 805 F.2d 719, 731 (7th Cir.1986); *In re Camelot Motors Corp.*, 86 B.R. 520, 522 (Bankr.W.D.Mich.1988); *In re Almarc Manufacturing, Inc.*, 62 B.R. 684, 686 (Bankr. N.D.Ill.1986); *In re American International Airways, Inc.*, 56 B.R. 551, 554 (Bankr.E.D.Pa. 1986); *Matter of Formed Tubes, Inc.*, 46 B.R. 645, 646 (Bankr.E.D.Mich.1985); *In re Saco Lo-*

requiring the new value to remain unpaid contradicts the policy behind the § 547(c)(4) exception. Trustee asserts that the unpaid requirement derives from § 547(c)(4)(B)'s language: "on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."

Nothing in the plain language of § 547(c)(4) suggests new value must remain unpaid. Further, nothing in the legislative history suggests new value must remain unpaid.

*In re Thomas W. Garland, Inc.*, 19 B.R. 920 (Bankr.E.D.Mo.1982), considered the legislative history of § 547(c)(4)(B). In *Garland*, the trustee sought to recover nine payments made by the debtor to a utility company. *Id.* at 921. The utility company supplied the debtor with service throughout the preference period and claimed defenses under § 547(c). *Id.* The § 547(c)(4) issue ultimately focused on seven payments totalling $7,277.48. *Id.* at 929. After the first of these seven payments, the utility company provided the debtor with service worth $8,073.73. *Id.*

The court's analysis in *Garland* relied heavily on the legislative history of § 547(c)(4). The court noted that § 547(c)(4) arose from the judicially created "net result rule" [8] under § 60(a) and (c) [9] of the Bankruptcy Act. *Id.* at 922. When Congress drafted § 547(c)(4), "[a]mong oth-

er revisions [to § 60(c) ], the language 'the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy,' was deleted." *Id.* at 925. Thus, Congress expressly excluded language requiring new value to remain unpaid. Second, *Garland* held that § 547(c)(4) modified the net result rule by requiring new value to come "after" a transfer. *Id.* at 926. The prior judicially created net result rule allowed *any* new value during the preference period to be netted against any transfer during the preference period. *Id.* Finally, *Garland* held that the modified net result rule of § 547(c)(4) retained the same equitable policy considerations as the judicially created net result rule:

> An acknowledgement of the net result rule in the legislative history serves to emphasize that the drafters of the Code were attempting to retain at least the principles behind the rule in section 547(c)(4) and to recognize the realities of ordinary business transactions. Section 547(c)(4) serves the general goals of the preference provisions of the Code. *A creditor is encouraged to cooperate with a financially troubled debtor and is protected to the extent that he extends new credit in reliance on prior payments.*

*Id.* (emphasis added).

This policy conclusion is also supported by a majority of authority.[10]

> If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, *the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy* may be set off against the amount which would otherwise be recoverable from him.

19 B.R. at 925 (emphasis supplied).

---

cal Development Corp. (Rovzar v. Chemical Sales and Service Co.), 30 B.R. 862, 866 (Bankr. D.Ma.1983); *Matter of Bishop*, 17 B.R. 180, 183 (Bankr.N.D.Ga.1982).

**8.** Courts developed the net result rule to alleviate perceived inequities under § 60(a) and (c) of the Bankruptcy Act of 1898. 19 B.R. at 922–25. The net result rule can be characterized as follows:

> When, for goods sold and delivered, payments are made on a running or open account between the parties in the regular course of business within the 90–day period, without knowledge on the part of the creditor of the debtor's insolvency, and the net result of these transactions is to enrich the debtor's estate by the total sales, less the total payments, such payments or transfers are not preferential....

*Id.* at 922 (citing 4 Collier on Bankruptcy ¶ 547.40 at 547–125, 126. (15th ed. 1981)).

**9.** Section 60(c), 11 U.S.C. § 96(c), provided:

**10.** *See, In re Meredith Manor*, 902 F.2d 257, 259 (4th Cir.1990) ("[Section 547(c)(4) furthers] the legislative goal of encouraging creditor assistance to financially troubled debtors."); *In re Almarc Manufacturing, Inc.*, 62 B.R. 684, 688 (Bankr.N.D.Ill.1986) ("The key focus under § 547(c)(4) is to treat fairly a creditor who has replenished the estate after having received a preference."); *In re Olympic Foundry Company*, 51 B.R. 428, 431 (Bankr.W.D.Wash.1985) ("Section 547(c)(4) was intended to encourage credi-

In applying § 547(c)(4), the court noted that each transfer was followed by a supply of new value greater than the transfer, as measured by the *total* amount of new value supplied after the transfer. *Id.* at 929. Thus, *Garland* held that each preferential transfer was avoidable until exceeded by subsequent advances of new value.[11] A clear majority of authority holds that § 547(c)(4) creates a "subsequent advance rule,"[12] and the *Garland* interpretation best promotes the § 547(c)(4) policy of encouraging creditors to do business with troubled debtors.[13]

*Garland* interpreted § 547(c)(4)(B)'s "otherwise unavoidable" language as an accounting safeguard. The court had previously found that several transfers were subject to a § 547(c)(2)[14] defense. *Id.* at 928. Therefore, the court removed the § 547(c)(2) transfers from consideration in determining the transfers subject to § 547(c)(4). *Id.* at 929. This approach satisfied § 547(c)(4)(B) because the new value calculation did not include any "otherwise unavoidable" transfers or offsetting utility service. *Id.* "Each dollar of the preferential payment may be set off against each dollar of new value, but the set off may not be greater than dollar for dollar." *Id.* Thus, if a dollar of goods offsets a transfer dollar via § 547(c)(1) or (2), that same dollar of goods cannot be used again to offset a different transfer dollar via § 547(c)(4). Two other courts have reached a similar conclusion,[15] and several courts have as-

tors to do business with troubled businesses."); Collier ¶ 547.12 at 547–49. ("[Section 547(c)(4)] promotes equality of treatment among creditors, because its utility is limited to the extent to which the estate was enhanced by the creditor's subsequent advances during the preference period.")

**11.** Under § 547(c)(4)'s "after" language, only subsequent new value advances can offset a transfer, not prior new value advances.

**12.** *See, In re Gold Coast Seed Co.,* 30 B.R. 551, 553 (9th Cir. BAP 1983); *Manor,* 902 F.2d at 259; *Jet Florida,* 841 F.2d at 1084; *Prescott,* 805 F.2d at 728; *In re Fulghum Const. Corp.,* 706 F.2d 171, 172 (6th Cir.1983); *In re Baumgold Bros., Inc.,* 103 B.R. 436, 439 (Bankr.S.D.N.Y. 1989); *American International,* 56 B.R. at 553; *In re Paula Saker & Co., Inc,* 53 B.R. 630, 634 (Bankr.S.D.N.Y.1985); *Olympic Foundry,* 51 B.R. at 430; *Matter of Isis Foods, Inc.,* 39 B.R. 645, 649 (W.D.Missouri 1984); *In re Keydata Corporation,* 37 B.R. 324, 328 (Bankr.D.Mass. 1983); *Saco,* 30 B.R. at 866; 4 Collier ¶ 547.12 at 547–49.

**13.** *Manor* considered and rejected an alternative rule proposed in *Leathers:* "Basically, under the *Leathers* approach, the creditor is protected only to the extent that it gives 'new value' subsequent to each preference but before the next payment is received from the debtor." *Manor,* 902 F.2d at 258. *Manor* concluded:

After consideration of both methods, we think … the *Garland* rule, in addition to better serving the legislative goal of encouraging creditor assistance to financially troubled debtors, also reflects a more realistic view of commercial practices. An open credit line is a fluid relationship which normally does not emphasize individual loan repayments. Instead, it is the debtors' entire financial picture and repayment history, not the latest pay-

ment, which are the bases for maintaining the line of credit. For the reasons more completely set forth in *Garland,* we affirm the district court.

*Id.* at 259.

*Garland* noted *Leathers* would place a limitation on a creditor's right of setoff not found in § 547(c)(4), and the *Leathers* interpretation suggests treating a transfer and a new value advance as a substantially contemporaneous exchange, which is already covered by § 547(c)(1). *Garland,* 19 B.R. at 926.

**14.** Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms. . . .

**15.** *See, In re Check Reporting Systems, Inc.,* 140 B.R. 425, at 433 (Bankr.W.D.Mich.1992) ("That is (1) common sense would dictate that a creditor should not be able to assert a new value transfer as a defense to a preference if the transfer was paid for by the debtor because the estate was not made whole by the new value transfer. But, (2) by the same token, the trustee should not be able to assert the new value was paid if the trustee is asserting that the paying transaction was in fact a preference which the trustee can avoid."); *In re Kroh Brothers Development Co.,* 104 B.R. 182, 195 (Bankr.W.D.Mo. 1989) ("If a transfer made on account of the new value were 'otherwise unavoidable,' then a creditor could not meet the requirements of

serted that § 547(c)(4)(B) does not require new value to remain unpaid.[16]

In summary, *Garland* highlights three basic principles underlying § 547(c)(4). First, § 547(c)(4)'s subsequent advance rule makes preferential transfers avoidable until offset by subsequent advances of new value. Second, Congress drafted § 547(c)(4) to retain the net result rule's policy of encouraging creditors to continue doing business with troubled debtors by protecting transfers received by creditors from preference actions to the extent goods provided by such creditors replenish the estate during the preference period. Third, § 547(c)(4)(B) does not require new value to remain unpaid, but rather acts as a safeguard against double counting.

Trustee cites a line of cases, beginning with *Matter of Bishop*, 17 B.R. 180 (1982), that allegedly stand for the proposition that § 547(c)(4)(B) requires new value to remain unpaid. In *Bishop*, the trustee tried to recover preferential loan payments made by the debtor to a creditor bank during the preference period:

| Payments | Loans |
| --- | --- |
| $18,418.50 (on prior note) | |
| | $9,140.80 (note 1) |
| | $19,300.00 (note 2) |
| | $10,000.00 (note 3) |
| $1,828.16 (on note 1) | |
| $19,800.00 (on note 2) | |

*See*, 17 B.R. at 181.

*Bishop* interpreted § 547(c)(4)(B) as requiring new value to remain unpaid. *Id.* at 183. To determine the amount of unpaid new value, the court offset the last two transfers of $1,828.16 and $19,800.00 against the loans, and concluded that the creditor had an unpaid new value defense of $16,812.64 against the first transfer of $18,418.50. *Id.* Additionally, the creditor sought summary judgment that the trustee was entitled to recover no more than $1,605.86, the net of preferential transfers made over all new loans made during the preference period. *Id.* The creditor argued that the judicial net result rule survived the enactment of § 547(c)(4) and continued to operate independently of the statutory defense. *Id.* Relying on the legislative history, the court appropriately held that "the net result rule has no application under § 547(c)(4) of the Code and ... this court may not grant summary judgment ... limiting the amount recoverable by the [t]rustee to $1,605.86...." *Id.* at 185. By refusing to grant the summary judgment request, the *Bishop* court appeared to hold that the trustee could recover the last two transfers as preferential even though these two transfers were also used to offset the new value loans.

The application of debtor's last two transfers of $1,828.16 and $19,800.00 to offset new value given prior to those transfers in *Bishop* clearly contradicts the plain language of § 547(c)(4) because only § 547(c)(4)(A) and (B) specify what may be used to reduce the amount of a new value defense. Specifically, a new value defense may be reduced under § 547(c)(4)(A) to the extent that the new value is secured, and may also be reduced under § 547(c)(4)(B) to

---

§ 547(c)(4)(B) and should not get the benefit of the subsequent new value in the form of an offset against the previous preferential transfer.").

16. *See, Check Reporting*, 140 B.R. at 432 ("We add that section 547(c)(4) does not contain any language that even suggests that the new value rule contained therein is somehow to be limited to unpaid invoices."); *Kroh*, 104 B.R. at 195 ("It is true that the majority of courts apply an 'unpaid new value' requirement. However, after reviewing the statutory language, the *Isis* decision and the case law from other jurisdic-

tions it appears that Judge Oliver's analysis of the specific facts in *Isis* is correct."); *Saker*, 53 B.R. at 634 ("Interpreting the language to require that the advance would not be repaid would, moreover, sharply limit the exemption to one subsequent advance when there is no indication that Congress so desired."); *Isis*, 39 B.R. at 653 ("The dictum in the cases ... to the effect that the new value must be 'unsecured' and go 'unpaid' is an inaccurate and confusing paraphrase of the clearly stated statutory purpose.").

the extent that a debtor does not subsequently make an otherwise unavoidable transfer to or for the benefit of the creditor. As discussed earlier, § 547(c)(4)(B) operates as an accounting safeguard, reducing a new value defense under § 547(c)(4) to the extent that the new value may have been used as a basis to otherwise offset a transfer under one of the other § 547(c) defenses. Such a use of new value under another § 547(c) defense would render the defensed transfer otherwise unavoidable. Because *Bishop* seems to hold that the last two transfers of $1,828.16 and $19,000.00 were avoidable, they cannot be otherwise unavoidable under § 547(c)(4)(B). These transfers, totalling $21,628.16, therefore should be entirely recoverable by the trustee and not used as an offset under § 547(c)(4)(B).[17]

Based on the analysis of *Bishop*, if the debtor's last transfers had totalled $50,000.00 instead of just $21,628.16, there would be no unpaid new value and the trustee would have been able to recover both the initial preferential transfer of $18,418.50 and the $50,000.00 transfer. Since a debtor controls the amount of a transfer made after new value is extended, to require that new value remain unpaid would mean that a debtor could eliminate a § 547(c)(4) defense by making a large preferential transfer just prior to filing to "pay" for the new value. Under *Bishop*, apparently a debtor could then also recover the transfer which "pays" for the new value under § 547. In effect, a debtor would benefit twice from any transfer. This is specifically what § 547(c)(4)(A) and (B) are designed to prevent. Allowing a transfer to be used twice against a creditor undermines the goal of encouraging creditors to do business with troubled debtors. If the unpaid new value limitation is upheld, creditors would be foolish to supply new value to debtors.

In contrast, the hypothetical $50,000.00 transfer under *Garland* would result in the creditor having a complete defense to the first preferential transfer and only the $50,000.00 transfer occurring subsequent to the new value would be avoidable.

In fact, this is the application followed by one of the cases cited by Trustee as following the *Bishop* analysis. In *In re Saco Local Development Corp. (Rovzar v. Chemical Sales and Service Co.)*, 30 B.R. 862, 866 (Bankr.D.Ma.1983), despite language that new value must remain unpaid, the court nevertheless applies § 547(c)(4) consistent with the *Garland* analysis. In *Saco* there were two preferential transfers totalling $17,572.52 before the creditor gave new value of $8,360.30. *Id.* at 866. After the creditor advanced the new value, the debtor made two additional preferential transfers of $5,034.92 and $7,843.83. *Id.* The court held that the creditor had a new value defense of $8,360.30 to the transfers prior to the new value, and that the preferential transfers after the new value were fully avoidable. *Id.* at 867.

*Bishop* is just plain wrong. It is inconsistent with the plain language of § 547(c)(4), and if applied, will cause creditors to abandon debtors in need.

## APPLICATION

Based on *Garland's* subsequent advance rule, the table below clearly shows Creditor has a complete new value defense under the § 547(c)(4) subsequent advance rule.

| Check Date | Check Amount | Goods Shipped | Preference |
|---|---|---|---|
| 4/25 | $ 18,475.86 | | $18,475.86 |
| | | $ 18,849.16 | $ 0.00 |
| 5/2 | $ 18,095.66 | | $18,095.66 |
| | | $ 33,063.18 | $ 0.00 |

---

17. Perhaps if there were an alternative § 547(c)(1) or (c)(2) defense, then the last two preferential transfers may be offset against prior loans which constitute the new value. In effect, that is what the court in *Bishop* does.

However, absent a determination that the transfers subsequent to the new value are subject to a contemporaneous exchange or ordinary course of business defense, such a offset is not supported by § 547(c)(4).

| Check Date | Check Amount | Goods Shipped | Preference |
|---|---|---|---|
| 5/11 | $ 16,197.93 | | $16,197.93 |
| | | $ 16,197.93 | $ 0.00 |
| 5/16 | $ 14,492.91 | | $14,492.91 |
| | | $ 17,280.78 | $ 0.00 |
| 5/23 | $ 18,056.21 | | $18,056.21 |
| | | $ 20,590.11 | $ 0.00 |
| 5/30 | $ 18,420.07 | | $18,420.07 |
| | | $ 23,056.79 | $ 0.00 |
| 6/6 | $ 18,922.37 | | $18,922.37 |
| | | $ 17,436.51 | $ 1,485.86 |
| 6/13 | $ 23,479.03 | | $24,964.89 |
| | | $ 15,967.54 | $ 8,997.35 |
| 6/20 | $ 17,127.20 | | $26,124.55 |
| | | $113,566.47 | $ 0.00 |
| 7/22 | | | |
| TOTALS: | $163,267.24 | $276,008.47 | $ 0.00 |

The "Goods Shipped" column is the sum of goods supplied between the dates of each check. The "Preference" column tracks the net preference outstanding after each transfer and subsequent new value advance. Note that there is no carryover of surplus new value to offset subsequent preferential transfers. Based on the goods shipped, as indicated in the above table, the Creditor has a complete defense.

The following table highlights the inequitable effect of the *Bishop* interpretation of § 547(c)(4) if it were applied:

| Ck Date | Check Amount | Goods Shipped | Unpaid New Value | Net Preference |
|---|---|---|---|---|
| 4/25 | $ 18,475.86 | | | $ 18,475.86 |
| | | $ 18,849.16 | $ 753.50 | $ 17,722.36 |
| 5/2 | $ 18,095.66 | | | $ 35,818.02 |
| | | $ 33,063.18 | $ 16,865.25 | $ 18,952.77 |
| 5/11 | $ 16,197.93 | | | $ 35,150.80 |
| | | $ 16,197.93 | $ 1,705.02 | $ 33,445.78 |
| 5/16 | $ 14,492.91 | | | $ 47,938.69 |
| | | $ 17,280.78 | $ 0.00 | $ 47,938.69 |
| 5/23 | $ 18,056.21 | | | $ 65,994.90 |
| | | $ 20,590.11 | $ 2,169.93 | $ 63,824.97 |
| 5/30 | $ 18,420.07 | | | $ 82,245.04 |
| | | $ 23,056.79 | $ 4,134.40 | $ 78,110.64 |
| 6/6 | $ 18,922.37 | | | $ 97,033.01 |
| | | $ 17,436.51 | $ 0.00 | $ 97,033.01 |
| 6/13 | $ 23,479.03 | | | $120,512.04 |
| | | $ 15,967.54 | $ 0.00 | $120,512.04 |
| 6/20 | $ 17,127.20 | | | $137,639.24 |
| | | $113,566.47 | $113,566.47 | $ 24,072.77 |
| 7/22 | | | | |
| TOTALS: | $163,267.24 | $276,008.47 | | $ 24,072.77 |

The Unpaid New Value column represents the new value advanced less any subsequent transfers before additional new value is advanced. The Net Preference column represents a running total of preferential transfers reduced by any "unpaid" new value.

Like *Bishop,* Trustee seeks to utilize the preferential transfers twice. First, Trustee would use the preferential transfers to offset the new value of $276,008.47. Trustee's interrogatory requested a list of unpaid invoices as of the petition date. Such a list would reflect Creditor's payables after application of the $163,267.24 to the payable balance of $276,008.47.[18] Trustee then seeks to recover the same $163,267.24 which had been previously applied to yield "unpaid" new value. This approach would penalize Creditor for supplying considerable goods to Debtor during the preference period. According to Trustee's calculations,[19] Creditor would have to return $72,895.17 to the estate and file an unsecured claim for the remaining $185,636.40. This result would cause suppliers to deny product to troubled debtors. For example, if Creditor had stopped supplying product to Debtor during the preference period, Debtor would not have received the goods valued at $276,008.47. The value of these shipments substantially exceeded any payments made on account by Debtor.

## CONCLUSION

Accordingly, Creditor is entitled to a complete new value defense against Trustee's preference claims. Creditor's motion for summary judgment is granted. Trustee's motion for summary judgment is denied. Given this result, I need not address § 547(c)(1) and (2).

Separate findings of fact and conclusions of law with respect to this ruling are unnecessary. This memorandum opinion shall constitute my findings of fact and conclusions of law.

---

**18.** The $22,359.16 discrepancy between the $112,741.23 that appears to remain unpaid based on the admitted values of preferential transfers made and goods shipped ($276,008.47 less $163,267.24 = $112,741.23) and Creditor's admission that $90,372.07 of invoices remained unpaid as of the petition date is unexplained, but the discrepancy does not affect the outcome of this case.

**19.** Trustee takes the admission of $90,267.24 as an offset to the transfers of $163,267.24 ($163,267.24 less $90,267.24 = $72,895.17).